
FILED

Mar 01 2016, 9:28 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT
Ivan A. Arnaez
Arnaez Law Offices
Evansville, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

---

# In the
# Indiana Supreme Court

No. 26S00-1410-LW-771

AUSTIN BLAIZE,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Gibson Circuit Court, No. 26C01-1301-MR-00001
The Honorable Jeffrey F. Meade, Judge

On Direct Appeal

**March 1, 2016**

**RUCKER, Justice.**

Arising out of a confrontation at the home of his ex-girlfriend's father, Austin Blaize was convicted of murder, attempted murder, felony murder, burglary resulting in serious bodily injury, intimidation with a deadly weapon, pointing a firearm, and carrying a handgun without a license. The jury recommended and the trial court imposed life without parole for the murder conviction, and the trial court imposed a term of years for the remaining convictions. In this direct appeal Blaize complains his convictions should be reversed and a new trial granted because of comments the trial judge made to the jury. We disagree and affirm the convictions and sentences.

## Facts and Procedural History

Austin Blaize and Brittany Monier began dating in 2010 when she was 17 and he was 20. Their contentious and at times violent relationship produced two children, a daughter born in 2011 and a son born in 2012. A mostly unemployed Blaize failed to support his children. Instead his parents and Brittany's parents filled the void. In May 2012, ending the relationship and declining Blaize's marriage proposal, Brittany moved in with her father, Terry Monier, who lived in the Indian Hills subdivision of Fort Branch in Gibson County, Indiana. One of Terry's conditions on Brittany living at his house was that Blaize was not allowed to visit. And Brittany told Blaize not to come to Terry's house.

According to Brittany, Blaize "went crazy" when she ended the relationship and told her that if she dated anyone else he would kill her, their children, and the person she was dating, adding, "[i]f I can't have you, no one else can." Tr. at 72. Though the relationship was over, Blaize continued to pester Brittany regularly by telephone and text messages, inquiring whether she was dating anyone and whether she would resume their relationship. Blaize would monitor Brittany's activity on Facebook to determine with whom she was socializing. And occasionally he would show up at Terry's home uninvited while Terry was at work.

On the morning of January 16, 2013, Blaize called Brittany and told her he had a new job and asked her if she would move back with him. Brittany declined, again telling Blaize their relationship was over. By this time, Brittany was in the early stages of a relationship with Josh

Webb who was visiting her daily and in fact was visiting at the time Blaize called. Webb had previously dated Blaize's sister, so the two men were acquainted with one another. Not satisfied with Brittany's rejection, Blaize called her several times that evening. And at some point Blaize and Webb had a brief conversation, with Blaize telling Webb they would meet "m[a]no to m[a]no" in Francisco. Tr. at 210. Blaize called again at 6:52 p.m. telling Webb they would meet up sooner.

Brittany then followed Webb into the attached garage where he intended to smoke a cigarette. When the light was turned on they saw Blaize standing there in a dark-colored hoodie. Following a brief exchange between Blaize and Webb, Blaize pointed a handgun at Webb's head and pulled the trigger. The handgun clicked but it did not discharge, and Blaize looked at it, exclaiming, "What the hell?" Tr. at 218.

Webb ran back into the house, and hearing screams Terry—who was home at the time—ran towards the garage door. Terry and Blaize struggled over the weapon as Terry tried to keep Blaize out of the house. Blaize then fired two shots. In a later autopsy examination, the pathologist recovered two .25 caliber bullets from Terry's body. The examination revealed Terry suffered "two gunshot wounds, one to the back of the head behind his left ear and the other to the left side of his chest." Tr. at 168. "They were both fatal wounds." Tr. at 178.

In the meantime Webb fled the house with Blaize in pursuit. A witness visiting the home of Terry's neighbor saw a person he was "[n]inety-eight percent" certain was Blaize walk by at a fast pace. Tr. at 363. And about one minute later he saw Webb, who appeared to be in shock, run into the neighbor's house yelling Blaize's name and hollering that someone had been shot and killed. The witness identified a dark colored hoodie found at the home of Blaize's grandmother as the hoodie he saw Blaize wearing on the evening of the shooting.

After briefly chasing Webb, Blaize returned to Terry's house, confronted Brittany, and pointed his handgun at both her and their young daughter. Blaize accused Brittany of cheating on him, declaring, "I can't believe you did this to me." Tr. at 127. He told Brittany to promise not to tell the police that he was the shooter and directed her to tell the police Webb shot Terry.

3

Blaize then left and Brittany called 911 as did Webb who by this time was at a neighbor's home. Police received the calls at 6:55 and 6:56 p.m. and soon arrived at Terry's house, where Brittany told them Blaize shot Terry and fired at Webb. Shortly before that time a neighbor's surveillance camera captured a white pickup truck driving through the area. Blaize would sometimes drive his grandfather's white pickup truck without permission.

Members of the Fort Branch Police Department arrested Blaize later that night at his grandmother's home in Francisco, a small community in Gibson County, and located a few blocks from the home of Blaize's grandfather. They seized Blaize's cell phone, and during an interview at the police station, Blaize acknowledged his possession of the phone throughout the evening.

While Blaize was in custody a cellmate heard Blaize say that "he took two [.]25 caliber pistols from his grandfather and took them both to make it into one that worked." Tr. at 1141. Blaize's grandfather testified that as of January 16, 2013, his .25 caliber handgun was missing from his home. And previously one of Blaize's friends had fired a small caliber handgun that Blaize had in his possession, but it "didn't go off. . . . It clicked. . . . The second time it fired." Tr. at 796-97. The weapon used in this case was never recovered.

A long-time friend of Blaize observed that Blaize had been keeping track of Brittany on Facebook. He noted that on the date of the shooting, Blaize was upset with Brittany for "hanging out with other guys," Tr. at 509, and he was upset while talking on his cell phone around 5:30 p.m. When he talked to Blaize later that evening between 7:00 p.m. and 7:30 p.m., Blaize was crying and saying he didn't want to go to jail for something he didn't do.

On January 17, 2013 the State charged Blaize with Count I murder; Count II attempted murder; Count III felony murder; Count IV burglary causing serious bodily injury; Count V intimidation with a deadly weapon; Count VI pointing a firearm; and Count VII carrying a handgun without a license. The State also sought a sentence of life without parole alleging two

aggravating circumstances: (1) intentional killing during a burglary or attempted burglary[1] and (2) murder by intentional discharge of a firearm into an inhabited dwelling.[2]

Jury selection began August 18, 2014, and the presentation of evidence commenced the following day. At the ten-day-long trial, in addition to evidence of the facts recited above, the State introduced the call records for Blaize's Verizon cell phone. To interpret those records the State presented Byron Lee, a Verizon engineer.

Lee testified about cell phone towers in Gibson County; the coverage areas of towers; explained how cell phone towers route calls; and how Verizon's call records contain a tower number and sector designation to indicate from what direction a phone call is coming. He referred to areas surrounding those towers as "sites," each of which is divided into three "sectors." Lee concluded that a person using Blaize's cell phone during the relevant time period on January 16 started out in Francisco and gradually moved closer to the lower section of the Fort Branch coverage area and eventually back into the Francisco coverage area. Lee testified that cell tower 217 sector 2 primarily covered the Francisco area, and cell tower 204 covered the Fort Branch area. According to Lee cell tower site 204-2 covered the Monier's house, and on the night of the killing Blaize's cell phone registered on that site at 6:52 p.m. According to Lee, by 7:13 p.m. Blaize's cell phone was again registering on site 217-2, in Francisco. This evidence was consistent with the State's theory of events placing Baize at or near the Monier residence when Terry was killed.

Blaize's counsel cross-examined Lee at length and elicited his acknowledgment that: (i) sometimes the coverage of towers overlaps; (ii) calls being placed will go to the tower with the strongest signal, not always the closest tower; (iii) usually but not always the closest tower has the strongest strength; (iv) a tower's signal can be affected by conditions like weather and terrain; and (v) information related to towers cannot be used to determine a phone user's specific location. The witness' cross-examination testimony contained numerous references to towers, sites, and sectors.

---

[1] See Ind. Code § 35-50-2-9(b)(1)(B) (2013).

[2] See I.C. § 35-50-2-9(b)(15)(A) (2013).

After the close of cross-examination the trial court announced a lunch recess and admonished the jurors which included the following exchange:

> THE COURT:  Then for the ladies and gentlemen of our jury, again, same admonishment.  You can discuss the case as long as you're all together in the jury room, but don't talk about the case under any other circumstances.  And, again, don't form or express any opinions until you've been given the case at the conclusion.
>
> And one final note. *Please attempt to stay within sector 3 of cell phone tower site 217.  If I find out anybody has been in sector 2 of cell phone tower 204 there's going to be trouble, if you can even understand that.  All right.*
>
> JUROR:  Actually we do.
>
> THE COURT: You do? That's all right. You got it. All right. Be back about maybe 1:10 or something like that.

Tr. at 1021 (emphasis added).[3]  No objection was raised concerning the trial court's comment.

After redirect examination of witness Lee and presenting other witnesses, the State rested.  In addition to calling several witnesses Blaize testified on his own behalf and denied shooting Terry, declaring instead he did not go to Terry's house, Indian Hills, or Fort Branch on the evening of the killing.  According to Blaize, he was present at his grandmother's home in Francisco that evening and left with the intent of picking up his children; and by walking and hitching a ride, he made it no further than a highway intersection which was roughly halfway between Francisco and Indian Hills.  Blaize testified he then changed his mind and returned to his grandmother's house.[4]

The guilt phase of trial concluded August 28, 2014, and the jury found Blaize guilty of murder as charged and also found him guilty on all the remaining counts.  The jury then

---

[3] It appears from the record that sector 3 of cell phone tower site 217 was the closest tower to the courthouse.  Index of Exhibits at 83, State's Ex. 77.  The crime scene was located in sector 2 of cell phone tower 204.

[4] This recitation was an apparent attempt to account for testimony of witness Lee concerning the various locations of the person using Blaize's cell phone on the night of the shooting.

reconvened for the penalty phase of trial after which the jury found Blaize intentionally killed Terry Monier and that the State proved the charged aggravators beyond a reasonable doubt. Presumably the jury also found that Blaize's proffered mitigating circumstances were outweighed by the charged aggravators.[5] The jury thus recommended a sentence of life imprisonment without parole for the murder conviction. The trial court accepted the recommendation and sentenced Blaize accordingly. In addition the trial court imposed an aggregate term of 78 years imprisonment for the remaining convictions to be severed concurrently with the life imprisonment sentence. Pursuant to Indiana Appellate Rule 4(A)(1)(a), this Court has mandatory and exclusive jurisdiction over this appeal. Additional facts are set forth below as necessary.

## Discussion

We rephrase the single claim Blaize raises on appeal: whether the trial court's comment regarding the cell tower evidence deprived him of a fair trial by vouching for the credibility of the State's evidence and thereby discrediting his alibi defense. Blaize thus seeks reversal of his conviction and a remand for a new trial.

As a preliminary matter, we acknowledge the State's argument that Blaize failed to preserve this issue for appellate review because he neither objected to the comment at trial nor requested an admonishment or moved for a mistrial. Our courts have long held that "[w]here a defendant fails to object or otherwise challenge a trial judge's remarks, any alleged error is waived on appeal." Garrett v. State, 737 N.E.2d 388, 391 (Ind. 2000) (citing Cornett v. State, 450 N.E.2d 498, 505 (Ind. 1983) (holding that a defendant who failed to object to trial judge's comments and move for a mistrial waived review of a claim that the judge failed to maintain impartiality); Smith v. State, 558 N.E.2d 841, 843 (Ind. Ct. App. 1990) (finding that defendant

---

[5] We say "presumably" because the record before us does not include the jury instructions, one of which would likely have provided that before a sentence of life imprisonment without parole may be imposed, the jury must find among other things, "any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." I.C. § 35-50-2-9(l)(2) (2013). In closing argument the State referred to the jury instructions noting "[y]ou have to make that decision which one outweighs the other. Does my - - does the State's aggravators outweigh the defendant's mitigators?" Tr. at 1562. In any event, on appeal Blaize raises no issue in this regard.

waived review of his claim that he was entitled to a change of judge where he failed to argue the merits of his claim during a hearing before the trial court)). However, the doctrine of fundamental error provides "an exception to the general rule that the failure to object at trial constitutes procedural default precluding consideration of the issue on appeal." Halliburton v. State, 1 N.E.3d 670, 678 (Ind. 2013). This "exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Id. (quoting Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006)). "The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process." Id. (quoting Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010)).

"A criminal defendant has a right to a fair trial before an impartial judge." Harris v. State, 963 N.E.2d 505, 506 (Ind. 2012) (citation omitted). "A fair trial before an impartial judge is an essential element of due process; the trial court thus has the duty to remain impartial and refrain from making unnecessary comments or remarks." Harrington v. State, 584 N.E.2d 558, 561 (Ind. 1992). And this is so because "the jurors' customary respect for the judge can lead them to accord great and perhaps decisive significance to the judge's every word and intimation. It is therefore essential that the judge refrain from any actions indicating any position other than strict impartiality." Everling v. State, 929 N.E.2d 1281, 1288 (Ind. 2010) (quotation and citation omitted).

Blaize insists that by referring to the cell phone tower evidence as the jury was dismissed for a recess, the trial judge "vouched for the accuracy of the cell phone tower technology and effectively harpooned [Blaize's] chances to have the jury take his alibi defense seriously." Br. of Appellant at 16. Blaize overstates his case. Although the judge's comment was perhaps ill-advised, not all inopportune remarks constitute reversible error. Cook v. State, 734 N.E.2d 563, 567 (Ind. 2000). Rather, the comment must interfere with the party's right to a fair trial or cause harm in some way. Id.

Here, the trial court made no further comment on the cell phone tower evidence after a juror replied in the affirmative that it understood the judge's comment. This remark was made

not during the presentation of evidence by either party or during the questioning of a witness, but occurred instead as the jurors were being admonished before a break. We do not view the trial court's comment so much as vouching for the accuracy of the tracking data, but rather an acknowledgement of the complexity of the cell phone tower evidence. In any event the record shows, among other things, the State presented evidence of two eyewitnesses to Blaize shooting the victim; a witness who saw Webb run into a house, panicked and stating that Blaize had shot the victim; a witness who saw Blaize walk by the window in a hoodie that was later recovered; a witness that gave testimony about a handgun Blaize possessed that functioned in the same manner as the handgun Blaize used in shooting Terry; the testimony of Blaize's grandfather that one of his handguns was missing, and an exhibit showing a white pickup truck – ostensively belonging to Blaize's grandfather – driving through the area the night of the shooting. Considering the evidence as a whole, we are not persuaded a two-sentence remark about cell phone towers and sites during the course of a ten-day trial made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process. Halliburton, 1 N.E.3d at 678. In sum, Blaize has failed to demonstrate the judge's comment amounted to fundamental error requiring reversal of his convictions and a new trial.

**Conclusion**

We affirm the judgment of the trial court.

Rush, C.J., and Dickson, David and Massa, JJ., concur.