ATTORNEY FOR APPELLANT
Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Kelly A. Loy
Andrew A. Kobe
Deputy Attorneys General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED
Dec 05 2017, 12:29 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

No. 82S00-1610-LW-576

CARLTEZ TAYLOR,

*Appellant (Defendant),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff).*

Appeal from the Vanderburgh Circuit Court, No. 82C01-1512-MR-7498
The Honorable David D. Kiely, Judge
The Honorable Michael J. Cox, Magistrate

On Direct Appeal

**December 5, 2017**

**Rush, Chief Justice.**

Seventeen-year-old Carltez Taylor was convicted of murder and conspiracy to commit murder, and sentenced to life without parole ("LWOP"). He appeals his convictions, arguing that the State's references to his nickname "Looney the Shooter" led to fundamental error, that the State untimely amended the conspiracy to commit murder charge, and that insufficient evidence supports his conspiracy to commit murder conviction. He also argues that his LWOP sentence is

inappropriate, violates the United States and Indiana Constitutions' proportionality requirements, and violates the Sixth Amendment because a jury never found a qualifying aggravator beyond a reasonable doubt. We reject his first three arguments, revise his sentence from LWOP to an aggregate eighty-year term, and decline to address his other challenges to LWOP.

## Facts and Procedural History

On the night after Thanksgiving in 2015, seventeen-year-old Carltez Taylor went with a friend to hang out at D.G.'s house. D.G. and one of her friends—both teenage girls—were home on weekend passes from a juvenile detention center. D.G. knew Taylor as "Looney," and introduced him that way to her mother, Lyn. Uncomfortable with Taylor and his friend, Lyn ordered the boys to leave. They went outside and smoked cigarettes, but soon snuck back into the house and to the basement.

Later that night, another teenage boy arrived, bringing a 9mm Hi-Point handgun. He handed it to one of the other boys, who removed the magazine and handed the gun to Taylor. Taylor then put the magazine back in the gun and stuck the Hi-Point into his waistband.

As the night wore on, D.G. texted J.W. (a recent fling) about hanging out and having sex. When Taylor found out, he called J.W. a "b****" and said he "wasn't s*** [and] wasn't about nothing." The three boys plotted about "b****ing him" or "punking him out," which D.G. described as fighting someone who does not want to fight.

The rhetoric escalated. Taylor threatened to beat up D.G. unless she got J.W. to come over. Afraid, D.G. began enticing J.W.—who was suspicious, repeatedly asking if it was a setup. But after D.G. lied that she was alone, J.W. ultimately agreed to meet her at the corner near her house. J.W. and his nephew, T.S., met her there shortly thereafter.

D.G. asked J.W. and T.S. if they were "strapped" (had guns on them)—they did not. Then, D.G. kept them waiting at the corner for about ten minutes, supposedly for her "sister." But instead of a friend, a figure wearing black emerged from between two houses, with a hood snugly tied around his face. Seeing him, J.W. and T.S. walked the other way.

As the hooded person approached, D.G. recognized him as Taylor and watched him pull out the 9mm Hi-Point. When shots started flying—five or six in total—J.W. and T.S. took off

running. They ran toward an alley, but when T.S. got there, he realized that J.W. was no longer with him. He returned to the street and found J.W. lying on the sidewalk, shot in the back.

T.S. then watched the shooter run past, recognizing him as Carltez Taylor, an acquaintance he knew from playing basketball. As Taylor ran by J.W., he said "CTK b****." J.W. and his friends were known as the "cream team," and "CTK" means "cream team killer." Within minutes, J.W. died on the sidewalk from a single gunshot wound to the back.

Before learning J.W.'s fate, D.G. and Taylor ran back to her house. As they arrived, Taylor grabbed D.G., put the still-hot gun to her head, and told her that if she said anything he would kill her. They returned to D.G.'s basement, where Taylor asked D.G. if he hit J.W. She told him that he did.

Taylor then removed his hoodie and texted a friend to pray for him. He and the other teenage boys hid the gun and magazine in separate parts of the basement's ceiling and made a large hole in the wall to hide inside.

The next day, T.S.'s family told police that Taylor was the shooter, and D.G. led detectives to the hoodie and the murder weapon. After DNA from the hoodie matched Taylor—leading to a warrant for his arrest—he turned himself in to police. Months later, when D.G. saw Taylor at juvenile court, he called her "the police" and said he "should have killed [her] when he had the chance."

The State charged Taylor with murder, attempted murder, and conspiracy to commit murder. The State filed a sentencing enhancement for all three offenses based on Taylor's use of a firearm, and sought LWOP based on the "committing murder by lying in wait" aggravator.

Just two days before trial, the State amended the conspiracy count to say that another teenager, not Taylor, supplied the handgun. Taylor objected that the amendment was untimely, but was overruled.

Taylor also asked the trial court to prevent the State's witnesses from using his nickname "Looney the Shooter" because of its undue prejudice. The court preliminarily agreed, but offered to reconsider at trial. During trial, Taylor did not object when a detective referred to him as "Looney the Shooter," nor when the State used the nickname in its closing argument.

The jury found Taylor guilty of murder and conspiracy to commit murder, and not guilty of attempted murder. It also found him eligible for an enhanced sentence for using a firearm.

At sentencing, the jury was specifically directed to consider Taylor's age as a mitigating factor. Ultimately, the jury recommended a sentence of life without parole. The court accepted the recommendation, sentencing Taylor to LWOP on the murder conviction plus fifteen years for the firearm enhancement, and to a concurrent thirty-five-year sentence on the conspiracy to commit murder conviction. It then merged the enhancement and concurrent sentence into LWOP.

Taylor now directly appeals both his convictions and his sentence to this Court, raising six issues. See Ind. Appellate Rule 4(A)(1)(a).

## Discussion and Decision

### I. The State's References to Taylor as "Looney the Shooter" Did Not Lead to Fundamental Error.

Taylor first argues that his trial was unfair because a State's witness said that Taylor's nickname was "Looney the Shooter" and because the State used that nickname to argue that he shot J.W. Taylor didn't object to either one of these uses at trial, so he argues fundamental error. The State responds that fundamental error review doesn't apply because Taylor may have decided not to object for strategic reasons.

The State is right that we will not review claims, even for fundamental error, when appellants expressly declare at trial that they have no objection. See Halliburton v. State, 1 N.E.3d 670, 678–79 (Ind. 2013). But that did not happen here. Taylor did not agree to the State's use of his "Looney the Shooter" nickname; he simply said nothing. Without evidence that this silence was strategic, we review for fundamental error. See id. at 679; Hitch v. State, 51 N.E.3d 216, 219 (Ind. 2016).

To prove fundamental error, Taylor must "show that the trial court should have raised the issue *sua sponte* due to a blatant violation of basic and elementary principles, undeniable harm or potential for harm, and prejudice that makes a fair trial impossible." Harris v. State, 76 N.E.3d 137, 140 (Ind. 2017).

Before trial, Taylor asked the trial court to bar the State's witnesses from calling him "Looney the Shooter." He acknowledged that "Looney" was relevant to his identity, but argued

4

that "Looney the Shooter" was too prejudicial. The trial court granted Taylor's request. Nonetheless, at trial the State asked its lead detective what Taylor's nickname was, and he told the jury "Looney the Shooter."

The State then used the nickname during closing argument. It argued that "Carltez Taylor began firing bullets at [J.W.] and [T.S.]. . . . Carltez Taylor refers to himself as Looney the Shooter, that is for your consideration." And later: "Is it reasonable to believe that someone who identifies themselves as Looney the Shooter would even let someone pull the trigger[?]"

These references to Taylor as "Looney the Shooter" were improper. True, calling him simply "Looney" was appropriate to prove Taylor's identity—D.G. knew him only as "Looney," that's how she introduced him to her mother, and Taylor had "Looney" tattooed on his forearm. See McAbee v. State, 770 N.E.2d 802, 805 (Ind. 2002). But "Looney" sufficed for that purpose, so adding "the Shooter" merely ratcheted up the prejudice. See id. (questioning the admissibility of nicknames that carry an "implication of wrongdoing"). Then, the State used the nickname in closing to argue that Taylor acted in accordance with his "unsavory or lawless character or reputation"—a prohibited use under Indiana Evidence Rule 404(a)(1). See id.

But despite their impropriety, the State's references to Taylor as "Looney the Shooter" did not lead to fundamental error. Of the State's eighteen witnesses, only one included "the Shooter" in Taylor's nickname. The State did bring up "Looney the Shooter" four times in its closing argument, but avoided the "repeated reliance" that could lead to fundamental error. Rosales v. State, 23 N.E.3d 8, 16 (Ind. 2015) (finding fundamental error after the State repeatedly relied on an inaccurate statement of law).

Plus, the other evidence against Taylor was strong, minimizing the danger that the jury found him guilty based on his nickname. The only two witnesses to the murder identified Taylor as the shooter; he was closely tied to the murder weapon and the clothes the shooter wore; and he made incriminating threats afterwards. This compelling evidence militates against fundamental error. See Blaize v. State, 51 N.E.3d 97, 102–03 (Ind. 2016).

The strong evidence against Taylor, considered as a whole, also undercuts Taylor's reliance on Oldham, where the Court of Appeals found fundamental error when the State used business cards and a novelty photograph "to paint Oldham as a dangerous criminal." Oldham v. State, 779 N.E.2d 1162, 1172 (Ind. Ct. App. 2002), trans. denied. As the court noted in Oldham, evidentiary

errors like these are not fundamental error "when there is overwhelming evidence of the defendant's guilt." Id. at 1173.

Again, eliciting Taylor's "Looney the Shooter" nickname violated the trial court's order in limine, and the State's closing argument was inappropriate under Evidence Rule 404. But these uses did not create undeniable harm or potential for harm, or make a fair trial impossible. Harris, 76 N.E.3d at 140. We thus see no fundamental error arising from the State's references to Taylor as "Looney the Shooter."

## II. The State's Amendment to Taylor's Conspiracy Charge Was Not Untimely.

Taylor's second contention is that the State violated Indiana Code section 35-34-1-5 (2014) by amending the conspiracy to commit murder charge just two days before trial. Specifically, the State amended one of its twelve alleged overt acts to say that another teenager, instead of Taylor, supplied the handgun used to murder J.W. Taylor argues that because this amendment was substantive, the State had to make it at least thirty days before the omnibus date. The State responds that the amendment was formal rather than substantive and was permissible because it did not prejudice Taylor's substantial rights. We agree with the State.

Our recent precedent shows that this amendment was a matter of form, not of substance. In Erkins v. State, we held that simply amending which conspirator performed an overt act was a formal amendment, because *any* conspirator's overt act satisfies the element. 13 N.E.3d 400, 406 (Ind. 2014) (quoting Ind. Code § 35-41-5-2); see also Fajardo v. State, 859 N.E.2d 1201, 1205 (Ind. 2007) ("[A]n amendment is of substance only if it is essential to making a valid charge of the crime."). And that is exactly what happened here: the amendment's only change was alleging that a co-conspirator, instead of Taylor himself, brought the gun.

Since the amendment was one of form, the trial court could allow it as long as it did "not prejudice the substantial rights of the defendant." I.C. § 35-34-1-5(c). These substantial rights "include a right to sufficient notice and an opportunity to be heard regarding the charge." Erkins, 13 N.E.3d at 405. "Ultimately, the question is whether the defendant had a reasonable opportunity to prepare for and defend against the charges." Id. at 405–06.

We see no indication that the amendment threatened Taylor's substantial rights. While the State offered the amendment only two days before trial, Taylor needed little notice because the amendment merely alleged that another teenager instead of Taylor supplied the handgun.

Nor did the amendment prejudice Taylor's defense. The State alleged twelve separate overt acts and had to prove only one beyond a reasonable doubt; it's unsurprising that Taylor declined to contest the overt act element at trial. Instead, he challenged identity, arguing that someone else pulled the trigger—a defense the amendment didn't hurt, and perhaps even helped. See Roush v. State, 875 N.E.2d 801, 807 (Ind. Ct. App. 2007). Notably, Taylor has not explained on appeal what he would have done with more time or how this amendment hindered his defense. See Ramon v. State, 888 N.E.2d 244, 252 (Ind. Ct. App. 2008).

In sum, because the amendment was neither untimely nor prejudicial, it was not error for the trial court to allow it.

## III.  Sufficient Evidence Supports Taylor's Conspiracy to Commit Murder Conviction.

Taylor next contends that the State presented insufficient evidence for the jury to conclude, beyond a reasonable doubt, that he was guilty of conspiracy to commit murder. Our standard of review is deferential to the factfinder: "we consider only the evidence and reasonable inferences most favorable to the convictions, neither reweighing evidence nor reassessing witness credibility." Griffith v. State, 59 N.E.3d 947, 958 (Ind. 2016). We will reverse only if no reasonable factfinder could find Taylor guilty. See id.

The State's burden was to prove that Taylor, with the intent to commit murder, agreed with another person to commit murder and that Taylor or an accomplice performed an overt act in furtherance of the agreement. I.C. § 35-41-5-2 (2014); Russell v. State, 743 N.E.2d 269, 274 (Ind. 2001). A formal agreement to kill J.W. is not required; circumstantial evidence implying such an agreement is enough. Jester v. State, 724 N.E.2d 235, 239 (Ind. 2000).

Here, ample circumstantial evidence implied a conspiracy to murder J.W. When D.G. started texting J.W., Taylor and the other boys spoke of "b****ing him" or "punking him out." They also told D.G. to persuade J.W. to come over or else she would get beat up instead. This threat came shortly after the boys passed around a handgun, with Taylor loading the gun and

7

tucking it into his waistband. These facts show the seriousness of the situation, allowing the jury to infer that Taylor conspired with the other boys to murder J.W.

The jury also could have inferred that Taylor and D.G. agreed to murder J.W. When Taylor wanted D.G. to get J.W. to come over, D.G. didn't merely ask J.W. to drop by. Instead, she practically begged him to come, lying that she was alone and enticing him with offers of sex. When J.W. finally agreed and they met, D.G. immediately asked whether he and T.S. had guns. After finding out they did not, she kept them waiting in the open street for ten minutes, ostensibly waiting for her "sister." Taylor took that opportunity—created by D.G. at his behest—to emerge from an alley between two houses and gun down J.W.

The teenagers' actions after the shooting further support an agreement to murder J.W. See Shane v. State, 716 N.E.2d 391, 397 (Ind. 1999) (upholding a conspiracy to commit murder conviction in part because the defendant helped dispose of the murder weapon). After shooting J.W., Taylor ran back to D.G.'s house, and D.G. followed only steps behind. Taylor rejoined the other boys in the basement while D.G. threw off the police by describing the shooter as the "exact opposite" of Taylor. Together, the boys then hid the Hi-Point and its magazine in the basement's ceiling tiles and ripped out drywall so they could hide in the wall.

This circumstantial evidence is enough to show an agreement to murder J.W. See Bonds v. State, 721 N.E.2d 1238, 1242 (Ind. 1999); Isom v. State, 501 N.E.2d 1074, 1075 (Ind. 1986). And it is more than in Seketa v. State, where the Court of Appeals reversed a conspiracy to commit aggravated battery conviction because the most that could be inferred was "an agreement to humiliate [the victim] or even to rough him up a little." 817 N.E.2d 690, 697 (Ind. Ct. App. 2004). Sufficient evidence thus supports Taylor's conviction for conspiracy to commit murder.

## IV. We Revise Taylor's LWOP Sentence to the Maximum Term of Years for Murder.

Fourth, Taylor argues that his LWOP sentence is inappropriate and should thus be reduced to a term of years.

Under Article 7, Section 4 of the Indiana Constitution, we "have, in all appeals of criminal cases, the power to . . . review and revise the sentence imposed." Ind. Const. art. 7, § 4; Wilkes v. State, 917 N.E.2d 675, 693 (Ind. 2009). We have implemented this power through Appellate Rule

7(B), which allows us to revise sentences that are "inappropriate in light of the nature of the offense and the character of the offender." See Gibson v. State, 51 N.E.3d 204, 215 (Ind. 2016).

Our "principal role" under Rule 7(B) is to "leaven outliers." Id. We thus reserve our 7(B) authority for "exceptional" cases, Gibson v. State, 43 N.E.3d 231, 241 (Ind. 2015), and have revised sentences only six times in the last five years. See Wampler v. State, 67 N.E.3d 633, 635 (Ind. 2017); Eckelbarger v. State, 51 N.E.3d 169, 170 (Ind. 2016); Parks v. State, 22 N.E.3d 552, 555–56 (Ind. 2014); Fuller v. State, 9 N.E.3d 653, 659 (Ind. 2014); Brown v. State, 10 N.E.3d 1, 8 (Ind. 2014); Kucholick v. State, 977 N.E.2d 351, 351–52 (Ind. 2012).

While we apply our power under Rule 7(B) sparingly, we may revise sentences "when certain broad conditions are satisfied." Rice v. State, 6 N.E.3d 940, 947 (Ind. 2014). Sentence appropriateness thus turns on "myriad . . . factors that come to light in a given case." Cardwell v. State, 895 N.E.2d 1219, 1224 (Ind. 2008). We begin this analysis with "substantial deference to the trial court's sentence," then "independently examine" the defendant's offenses and character. Satterfield v. State, 33 N.E.3d 344, 355 (Ind. 2015).

Taylor's LWOP sentence was lawful. During the sentencing phase, the State argued only one aggravating circumstance—that Taylor committed the murder by lying in wait. See Ind. Code § 35-50-2-9(b)(3) (Supp. 2015). Taylor argued, and the State admitted, that his young age was a mitigating circumstance. See I.C. § 35-50-2-9(c)(7). The jury found that the State had proven the lying-in-wait aggravator and recommended LWOP, and the trial court accepted that recommendation.

But "[e]ven where a trial court has not abused its discretion in sentencing, the Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decision." Eckelbarger, 51 N.E.3d at 170. This includes sentences where—as here—"the trial court has been meticulous." Childress v. State, 848 N.E.2d 1073, 1079–80 (Ind. 2006). Ultimately, our constitutional authority to review and revise sentences "boils down to [our] 'collective sense of what is appropriate.'" Brown, 10 N.E.3d at 8 (quoting Cardwell, 895 N.E.2d at 1225).

LWOP is the harshest punishment the Constitution permits against any child. See Roper v. Simmons, 543 U.S. 551, 578 (2005) ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."). It's a denial of hope, a killer of behavior and character improvement, and a

9

guarantee—regardless of future potential—of a death behind bars. See Brown, 10 N.E.3d at 8. As such, it "is reserved for use in only the most heinous of crimes that so shock our conscience as a community." Conley v. State, 972 N.E.2d 864, 880 (Ind. 2012).

Indeed, only four other juveniles in the State of Indiana have ever received such a sentence. Id. at 880 nn.6–8 (collecting cases). One of those juveniles, Daniel Boyd, never appealed his sentence. Id. at 880 n.6. Two more, Larry Newton and Gregory Dickens, never challenged the appropriateness of their sentences under Rule 7(B). See Newton v. State, 894 N.E.2d 192 (Ind. 2008); Newton v. State, 83 N.E.3d 726, 744 n.13 (Ind. Ct. App. 2017); Dickens v. State, 754 N.E.2d 1 (Ind. 2001); Dickens v. State, 997 N.E.2d 56 (Ind. Ct. App. 2013), trans. denied. We have thus upheld the appropriateness of LWOP for a juvenile only once. Conley, 972 N.E.2d at 880. With this background in mind, we consider Taylor's offenses and character.

For the nature of the offenses, Taylor recognizes that his crimes were tragic and senseless but argues that they were not the most heinous of offenses. For his character, Taylor admits that he has a juvenile record and relies primarily on his youth as a mitigating factor. The State responds by pointing to Taylor's planning, manipulation, murder of a defenseless victim, and lack of repentance. We agree with the parties that Taylor's crimes were both senseless and heinous. He lay in wait and murdered another juvenile by shooting him in the back as he ran away.

Still, we consider many factors in weighing 7(B) revisions. "[M]ost significantly" here, Taylor was only seventeen years old at the time of the crimes. See Brown, 10 N.E.3d at 6. As this Court and the United States Supreme Court have recognized, "children are different." Id. (quoting Miller v. Alabama, 567 U.S. 460, 480 (2012)). "[J]uveniles are less culpable than adults and therefore are less deserving of the most severe punishments." Id. at 7 (citing Graham v. Florida, 560 U.S. 48, 68 (2010)).

Three reasons bear this out. First, as compared to adults, children lack maturity and have "an underdeveloped sense of responsibility." Id. (citing Graham, 560 U.S. at 68). Second, they are more vulnerable to negative influences and pressures—including peer pressure—and thus lack control over and the ability to escape from crime-producing environments. Id. And third, their character is less developed than that of adults, so their actions are less likely to show "irretrievable depravity." Id. (alterations omitted) (quoting Miller, 567 U.S. at 471).

We see these factors' influence on Taylor. He knew every part on a car and had moves on the basketball court, but he was still growing up and trying to find his identity. As he fell out of church, he fell in with bad influences—other juveniles who, as already explained, were heavily involved in J.W.'s murder. Taylor also grew up fatherless, "lacking the all-important direction" a father provides. See Bible v. State, 253 Ind. 373, 383–84, 254 N.E.2d 319, 324 (1970). And the neighborhood he'd always known as home had changed, with rising gang activity and alcohol and drug abuse.

Taylor's life story certainly does not absolve him of responsibility for his heinous and senseless crimes. But LWOP "forswears *altogether* the rehabilitative ideal." Brown, 10 N.E.3d at 8 (emphasis added) (quoting Miller, 567 U.S. at 473); see also Ind. Const. art. 1, § 18 ("The penal code shall be founded on the principles of reformation . . . ."). It takes away from Taylor the opportunity to emulate his adopted uncle Chavis Jefferson, who described himself at seventeen as the good Dr. Jekyll around his parents but the evil Mr. Hyde around his friends. Mr. Jefferson was incarcerated at a young age, but has since "straightened up," becoming a productive member of society for over forty years.

Along with Taylor's offenses and character, we consider our caselaw in line with our principal role of leavening outliers. See Knight v. State, 930 N.E.2d 20, 22 (Ind. 2010). While we have been clear that LWOP sentences are not always inappropriate for juveniles, see Conley, 972 N.E.2d at 876–77, we also have "not been hesitant to reduce maximum sentences for juveniles convicted of murder," Brown, 10 N.E.3d at 7–8 (collecting cases).

In Fuller and Brown, two juvenile codefendants received 150-year sentences for a double murder. Fuller, 9 N.E.3d at 655; Brown, 10 N.E.3d at 3. We unanimously revised fifteen-year-old Fuller's sentence to eighty-five years and sixteen-year-old Brown's sentence to eighty years because, while their crimes were "senseless and reprehensible," no evidence showed "that the victims were tortured, beaten, or lingered in pain." Fuller, 9 N.E.3d at 657 (quoting Brown, 10 N.E.3d at 5). And "most significantly," we considered their ages, as "[s]entencing considerations for youthful offenders—particularly for juveniles—are not coextensive with those for adults." Id. (quoting Brown, 10 N.E.3d at 6); see also Carter v. State, 711 N.E.2d 835, 843 (Ind. 1999) (reducing a sixty-year sentence for murder to fifty years because of the defendant's "very youthful age"); Walton v. State, 650 N.E.2d 1134, 1137 (Ind. 1995) (reducing a sixteen-year-old's double-

11

murder sentence from 120 to eighty years); <u>Widener v. State</u>, 659 N.E.2d 529, 534 (Ind. 1995) (reducing seventeen-year-old's felony murder sentence from sixty to fifty years).

Compare these cases with <u>Conley</u>, where we did not reduce Conley's LWOP sentence after he murdered his ten-year-old brother with his bare hands. <u>Conley</u>, 972 N.E.2d at 869–70, 880. Rather than "nearly instantaneous death by a bullet," Conley committed "a drawn out crime" of "unimaginable horror and brutality." <u>Id</u>. at 876.

Revising sentences by placing crimes "along a spectrum of heinous to horrific in no way diminishes the seriousness of any particular offense or the suffering of any particular victim." <u>Hamilton v. State</u>, 955 N.E.2d 723, 728 (Ind. 2011). But it does uphold important distinctions by reserving the harshest punishments for the most heinous crimes, <u>see id.</u>; <u>Inman v. State</u>, 4 N.E.3d 190, 204 (Ind. 2014)—as shown by the exceptional rarity of LWOP sentences for Indiana children, <u>see</u> <u>Conley</u>, 972 N.E.2d at 880 nn.6–8.

Our collective judgment is that Taylor's character and the nature of his offense—grievous as it was—do not warrant making him Indiana's fifth juvenile sentenced to a guaranteed death in prison. Instead, we revise his sentence to an aggregate eighty years: sixty-five years—the maximum term of years—for murder, plus a fifteen-year enhancement for using a firearm. <u>See</u> I.C. §§ 35-50-2-3, -11. We leave intact Taylor's concurrent thirty-five-year conspiracy to commit murder sentence.[1]

## Conclusion

We affirm Taylor's convictions and remand to the trial court to enter a sentencing order consistent with this opinion.

David and Goff, JJ., concur.

Slaughter, J., concurs in part and dissents in part with separate opinion in which Massa, J., joins.

---

[1] Because of this revision, we do not address Taylor's final two arguments: that his LWOP sentence was constitutionally disproportionate and that the jury failed to make required special findings supporting LWOP.

**Slaughter, J., concurring in part, dissenting in part.**

I respectfully dissent from the Court's decision to reduce Taylor's sentence from life without parole to a term of years. There can be no doubt that reducing Taylor's sentence is within the Court's power. But sometimes the better use of power is to withhold its exercise. I would affirm Taylor's LWOP sentence because he does not satisfy our longstanding test for granting relief under Appellate Rule 7(B), which looks to both the nature of the offense and the character of the offender. On this record, Taylor fails both prongs.

Taylor's offense was the lying-in-wait murder of another seventeen-year-old, J.W., whom Taylor gunned down by shooting him in the back as the victim tried to run away. It was, as the Court observed, a "tragic and senseless" crime. But it was more than that. It was also a depraved and heinous crime, perpetrated against an unarmed and vulnerable juvenile who was lured into a death trap, where Taylor ambushed him. His crime reflects an utter disregard for human life. Had it been an adult, and not Taylor, who shot J.W. in the back as he ran away, we would have no occasion to find the offender deserving of a more lenient sentence; indeed, the adult offender would be eligible for the death penalty.

Nor, despite Taylor's age when he murdered J.W.—seventeen years, nine months, sixteen days—is Taylor entitled to 7(B) relief under the character-of-the-offender prong. Taylor had a significant juvenile history that, as the State says, "escalated in violence" over time. He was adjudicated a delinquent for criminal trespass; for battery resulting in bodily injury; and for theft of a firearm, dangerous possession of a firearm, and carrying a handgun without a license. Taylor was sentenced to the Indiana Department of Correction and placed at a juvenile boot camp. He was released from the boot camp in November 2015, only weeks before killing J.W. later that month. Moments after killing J.W., Taylor threatened D.G. by pointing a gun at her head and telling her that she would face the same fate if she squealed: "bitch[,] if you say anything I'll kill you." Later, after Taylor had been implicated, arrested, and was being held on J.W.'s murder, Taylor encountered D.G. at the same juvenile facility where they were both being detained. He told D.G. he should have killed her when he had the chance. Taylor's communicated threats and "regrets" to D.G. are not the words of a remorseful, repentant offender with a redeeming character deserving of judicial mercy.

After hearing all the evidence, including evidence of Taylor's age and upbringing, the jury unanimously recommended life without parole. The trial court then imposed that sentence, see I.C. 35-50-2-9(e)(2), and made findings amply supported by the record underscoring why Taylor is undeserving of 7(B) relief today, including:

- Taylor's "true nature … reflects irreparable corruption."

- His "criminal history and his behavior before, during and after he shot the victim, is [sic] indicative of one who lacks conscious [sic], who is unrepentant and who, if given another opportunity, would do exactly the same thing to another unwary victim."

Although I disagree with the majority's resolution of the LWOP issue, I am not unsympathetic to its concern with leaving intact a sentence that guarantees an offender will die in prison for acts committed as a juvenile. But Taylor is only the fifth juvenile in state history to receive an LWOP sentence. The infrequency with which these sentences are given to minors suggests that both prosecutors and juries take their responsibilities seriously and proceed cautiously before seeking and recommending what for juveniles is the ultimate punishment. As the Court notes, we upheld an LWOP sentence in Conley v. State, a case we described as involving "'a drawn out crime' of 'unimaginable horror and brutality.'" 972 N.E.2d at 876. I agree with that characterization. But I disagree that Conley set a floor below which any juvenile whose offense is thought to be any less monstrous will obtain 7(B) relief. That is the trend and, I fear, the implication of today's decision. As the Court recognizes, the point of Rule 7(B) is to "leaven outliers", not to achieve some perceived correct sentence, whatever that means. Four other juvenile-LWOP sentences are an insufficiently small sample size from which to draw any meaningful conclusions about which juvenile-murder sentences are outliers and which are in the mainstream.

The Court acknowledges that Taylor's LWOP sentence was "lawful", and that our 7(B) review of a sentence "boils down to [our] 'collective sense of what is appropriate.'" I would affirm Taylor's LWOP sentence both because it was lawful and because I prefer the jury's "collective sense of what [sentence] is appropriate" to our own. From the Court's decision to reduce Taylor's sentence to a term of years, I respectfully dissent.


Massa, J., concurs.

2