## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 08 2019, 10:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas C. Allen
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Morgan J. Braun,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

July 8, 2019

Court of Appeals Case No.
19A-CR-295

Appeal from the Allen Superior Court

The Honorable Frances C. Gull, Judge

Trial Court Cause No.
02D05-1709-F3-47

**Najam, Judge.**

# Statement of the Case

Morgan J. Braun appeals her conviction for neglect of a dependent, as a Level 3 felony, following a jury trial. Braun raises one issue for our review, namely, whether the trial court committed fundamental error when it admitted certain evidence.

We affirm.

# Facts and Procedural History

Braun is the mother of E.E. ("Child"), who was born on September 26, 2016. On December 28, Joshua Meyers, a family case manager with the Indiana Department of Child Services ("DCS"), performed a wellness check on Child. Meyers did not observe any visible injuries on Child. Later that day, Braun took Child to the home of Regina Braun, Child's paternal grandmother. While Child was in Regina's care that day, he was "absolutely fine[.]" Tr. Vol. II at 117. Braun again took Child to Regina's home the next day, which was Thursday, December 29. Regina watched Child from approximately 9:00 a.m. until noon. Child was "absolutely normal." *Id*. at 118.

That afternoon, Braun dropped Child off at the home of Eugene Estrada, Jr., Child's father ("Father"), prior to the start of her shift at a local restaurant. Shortly after she had arrived at work, Braun got a call from Father. Father told Braun that he had taken a shower with Child and that he had slipped in the shower while holding Child. Father told Braun that Child did not hit his head but that the shower rod had fallen and hit Child in the face.

Braun was still at work, so she called Regina. Braun was "panicked and upset," and she told Regina "that something had happened with" Child. *Id.* at 118. Braun asked Regina what she should do, and Regina suggested that Braun leave work. Braun was unable to leave work, so Regina suggested that Braun ask Father to send a picture of Child. Braun told Regina that she would call Regina back to "let [her] know what the results of that situation were." *Id.* at 119. That night, Regina sent a text message to Braun asking about Child. Braun told Regina that Child was "fine." *Id.*

The next morning, Braun took Child to a prescheduled wellness check. Dr. Thomas Van Den Driessche examined Child. Braun did not tell Dr. Van Den Driessche about Child's fall. Child's exam was "totally normal." *Id.* at 238.

Following the doctor's appointment, Braun again took Child to Regina's house. While in Regina's care, Child remained in his car seat. Regina "didn't like the position of his head" while he was in the seat. *Id.* at 120. "[I]t looked like it was farther down than it normally would be and like it might interfere with his airway[.]" *Id.* Regina asked Braun if everything was okay with Child. Braun told Regina that the doctors had "said it was okay." *Id.* Regina watched Child for approximately forty-five minutes that day. During that time, Child had "bubbles" coming out of his mouth, which "concerned" Regina because Child was not teething. *Id.* Child did not wake up, and he stayed in the same position in the car seat "the whole time" he was with Regina. *Id.* at 121. That evening, Braun worked from 4:00 p.m. until just before 9:00 p.m.

[8] In the early morning hours of Saturday, December 31, Braun took Child to the emergency room. Jamie Chaffe, a physician assistant, was the first medical professional to examine Child. Braun told Chaffe that Child had not been eating well, that he had an "abnormal" leg twitch, that Child was drooling, that Child was not following with his eyes as usual, and that Child "just wasn't himself." *Id.* at 150. Braun told Chaffe that Child's symptoms had started on Thursday. Chaffe ordered a CT scan for Child. That scan showed that Child had a subdural hematoma on the right and multiple hemorrhages on the left. Dr. Barbara Schroeder, an ophthalmologist, then examined Child. Dr. Schroeder observed that Child had hemorrhages throughout his entire right eye, and he had a few hemorrhages in his left eye. Child began to have seizures, and his condition deteriorated. Child's injuries were life threatening.

[9] Child was placed in a medically induced coma, and he was placed on life support. Child was ultimately in the hospital for fourteen days. As a result of his injuries, Child suffers from a traumatic brain injury and cerebral palsy. Since his release from the hospital, Child attends five appointments per week for occupational therapy, physical therapy, and speech therapy.

[10] The State charged Mother with neglect of a dependent, as a Level 3 felony.[1] The trial court then held a jury trial on November 14 and 15, 2018. During the State's opening argument, the State twice informed the jury that it would hear

---

[1] In a separate case, Father pleaded guilty to neglect of a dependent.

evidence that Child had two healing rib fractures when he went to the emergency room on December 31. Braun, who was represented by counsel, did not object to either statement.

[11] During the trial, the State presented the testimony of Dr. Chandrashekhar Yalamanchali. Dr. Yalamanchali testified that Child's drooling, not eating, and not being himself were symptoms of a head injury. Dr. Yalamanchali further testified that waiting to take Child to the hospital on Saturday morning when the symptoms had started on Thursday could have "[a]bsolutely" resulted in Child's death or caused Child's symptoms to be worse or to last longer. *Id*. at 161. Dr. Yalamanchali also testified that, given the severity of Child's injuries, Child would have had symptoms prior to arriving at the hospital. In addition, Dr. Yalamanchali testified that the cause of Child's injuries was not having been hit by the shower rod but, rather, that Child was "shaken." *Id*. at 162.

[12] The State also presented the testimony of Chaffe and Dr. Schroeder. Chaffe testified that Child's injuries were not consistent with a fall in the shower. And Schroeder testified that the hemorrhages in Child's eyes were caused by a "severe shaking injury." *Id*. at 189.

[13] Dr. Ralph Hicks, a pediatrician, also testified at Braun's trial. Dr. Hicks did not examine or treat Child, but he reviewed Child's medical records at the request of DCS. During Dr. Hicks' testimony, the State moved to admit as evidence X-rays that the hospital had taken of Child. Braun stated that she had "no objection" to the admission of that evidence. *Id*. at 205. Dr. Hicks testified that

poor eye contact, drooling, poor feeding, difficulty swallowing, and seizures are all symptoms of a traumatic brain injury in a three-month-old baby. Further, Dr. Hicks testified that, given Child's injuries, Child would have developed his symptoms within "seconds or perhaps minutes" after "whatever happened to him happened." *Id*. at 220. He also testified that a reasonable caretaker would have noticed Child's symptoms. Dr. Hicks further testified that a delay in treatment "certainly increases the risk of more severe complications and also increases the risk of death[.]" *Id*. at 218.

[14] Along with the injuries to Child's brain, Dr. Hicks testified that the X-rays showed that Child had previously sustained fractures to two of his ribs, which fractures had occurred ten days to two weeks prior to Child's admission to the hospital. He testified that the rib fractures were likely caused by "squeezing, forceful compression to the chest, . . . the result of an impact or drop, [or] some sort of direct trauma[.]" *Id*. at 213. He further testified that the rib fractures "would have been painful[.]" *Id*. Dr. Hicks testified that he did not believe Child's injuries were caused by a fall in the shower because he "wouldn't expect the . . . severity of the injuries" Child had from a shower rod and because falling in the shower "wouldn't explain the . . . healing rib fractures." *Id*. at 216. Braun did not object to any of Dr. Hicks' testimony concerning the rib fractures.

[15] Dr. Mark Kelly, a neurologist, also testified. Dr. Kelly testified that, based on the results of an MRI scan, Child's brain injuries happened twenty-four to forty-

eight hours before the scan had been taken. He also testified, without objection, that Child had healing rib fractures on two of his ribs.

[16] Finally, Dr. Van Den Driessche testified. Dr. Van Den Driessche testified that, during the wellness check he had performed on Child, Braun did not give him any information that Child had suffered a fall, had a leg twitch, had been drooling, had a loss of appetite, or otherwise was not himself.

[17] At the close of the evidence, the State presented its closing argument. During that argument, the State twice mentioned that Child had rib fractures that were healing at the time he was admitted to the hospital. Specifically, the State argued that, "this Child also had a healing rib fracture that . . . even if you weren't the one inflicting the rib fracture, in normal caretaking of the child you would have noticed something's going on, at least for the first few days of that rib fracture[.]" Tr. Vol. III at 33. Braun did not object to the State's discussion of the fractures during its closing argument. The jury found Braun guilty of neglect of a dependent, as a Level 3 felony. The trial court entered judgment of conviction accordingly and sentenced Braun to ten years in the Department of Correction. This appeal ensued.

## Discussion and Decision

[18] Braun appeals her conviction for neglect of a dependent, as a Level 3 felony. Braun's only argument on appeal is that the trial court committed fundamental error when it did not *sua sponte* disallow the State's arguments and evidence with respect to Child's prior rib fractures. As our Supreme Court has explained:

> A claim that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred. The fundamental error exception is extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denied the defendant fundamental due process. *The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process.* This exception is available only in egregious circumstances.

*Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (emphasis added; quotation marks and citations omitted). "To prove fundamental error," the appellant must show "that the trial court should have raised the issue *sua sponte* . . . ." *Taylor v. State*, 86 N.E.3d 157, 162 (Ind. 2017).

[19] On appeal, Braun contends that "[t]he court committed fundamental error by allowing extrinsic evidence of prior bad conduct to be admitted into evidence." Appellant's Br. at 18. Specifically, Braun contends that the statements and exhibits regarding Child's prior rib fractures were inadmissible evidence of a prior bad act under Indiana Evidence Rule 404(b), and that that evidence allowed the jury to make a "forbidden inference" regarding her guilt. *Id.* at 21.

[20] However, the question is not whether the evidence of the prior rib fractures was inadmissible. Rather, the question is whether the trial court committed fundamental error, which considers whether the complained-of failure to act by the court made "a fair trial impossible" or was a "clearly blatant violation[] of basic and elementary principles of due process." *Brown*, 929 N.E.2d at 207.

Indeed, as we have noted before, "fundamental error in the evidentiary decisions of our trial courts is especially rare." *Merritt v. State*, 99 N.E.3d 706, 709 (Ind. Ct. App. 2018), *trans. denied*. For example, our Supreme Court has explained that

> an error in ruling on a motion to exclude improperly seized evidence is not *per se* fundamental error. Indeed, because improperly seized evidence is frequently highly relevant, its admission ordinarily does not cause us to question guilt. That is the case here. The only basis for questioning [the defendant's] conviction lies not in doubt as to whether [she] committed these crimes, but rather in a challenge to the integrity of the judicial process. We do not consider that admission of unlawfully seized evidence *ipso facto* requires reversal. Here, there is no claim of fabrication of evidence or willful malfeasance on the part of the investigating officers and no contention that the evidence is not what it appears to be. In short, the claimed error does not rise to the level of fundamental error.

*Brown*, 929 N.E.2d at 207.

Here, Braun makes no argument on appeal to explain how the allegedly erroneous admission of evidence made a fair trial impossible or was contrary to basic and elementary principles of due process. Rather, as in *Brown*, the only basis Braun presents for challenging her conviction lies not in a challenge to whether she committed the crime but, rather, in a challenge to the integrity of the judicial process. *See id.* However, Braun was present at her trial and represented by counsel when the State discussed the rib fractures during its opening and closing arguments and when the State presented as evidence the X-rays and doctors' testimony about the rib fractures. Indeed, when the State

moved to admit the X-rays as evidence, Braun explicitly stated that she had "no objection." Tr. Vol. II at 205. Braun had the opportunity to object and to respond to that evidence either through cross-examination or by presenting her own evidence on the rib fractures. Further, Braun makes no claim that the State's evidence was fabricated or otherwise not what it appeared to be. Accordingly, "the claimed error does not rise to the level of fundamental error." *Brown*, 929 N.E.2d at 207. We affirm Braun's conviction.

Affirmed.

Baker, J., and Robb, J., concur.