## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 31 2018, 9:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jane H. Ruemmele
Hayes Ruemmele, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Donald G. Karr, Jr.,

*Appellant-Defendant / Petitioner,*

v.

State of Indiana,

*Appellee-Plaintiff / Respondent.*

January 31, 2018

Court of Appeals Case No.
29A02-1707-CR-1502

Appeal from the
Hamilton Superior Court

The Honorable
William J. Hughes, Judge
The Honorable
Wayne A. Sturtevant, Judge

Trial Court Cause Nos.
29D03-1505-F6-4047
29D05-1703-PC-1576

**Kirsch, Judge.**

[1] Following a jury trial, Donald G. Karr, Jr. ("Karr") was convicted of Level 6 felony domestic battery committed in the presence of a child less than sixteen years of age[1] and two counts of Level 3 felony rape.[2] The trial court sentenced Karr to two and one-half years for the battery conviction. For the two rape convictions, the trial court imposed concurrent fifteen-year sentences, with five years suspended on each, and ordered the rape sentences to be served consecutive to the battery sentence, for an aggregate executed sentence of twelve and one-half years. Karr filed a motion for a new trial, alleging ineffective assistance of trial counsel, and the trial court denied his motion. Karr appealed, but then sought a remand to the trial court in order to pursue post-conviction relief. We granted his request and dismissed his appeal without prejudice pursuant to *Davis v. State*, 267 Ind. 152, 368 N.E.2d 1149 (1977) and *Hatton v. State*, 626 N.E.2d 442 (Ind. 1993), allowing Karr to later file a new notice of appeal and raise both the issues that he would have raised in the original appeal along with new issues created by the post-conviction court's ruling on the petition for post-conviction relief.[3] *Appellant's App. Vol. II* at 33.

---

[1] *See* Ind. Code § 35-42-2-1.3.

[2] *See* Ind. Code § 35-42-4-1(a)(1).

[3] This procedure is referred to by Indiana courts as a *Davis/Hatton* procedure and involves a termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a post-conviction relief petition to be pursued in the trial court. *Talley v. State,* 51 N.E.3d 300, 302 (Ind. Ct. App. 2016), *trans. denied; see also* Ind. Appellate Rule 37(A) ("At any time after the Court on Appeal obtains jurisdiction, any party may file a motion requesting that the appeal be dismissed without prejudice or temporarily stayed and the case remanded to the trial court . . . for further proceedings. The motion must be verified and demonstrate that remand will promote judicial economy or is otherwise necessary for the

[2] Karr filed a petition for post-conviction relief, alleging claims of ineffective assistance of trial counsel, and the trial court denied Karr's petition, finding that it was barred by *res judicata*. Karr initiated this consolidated appeal and presents the following reordered and restated issues:

> I. Whether sufficient evidence supports Karr's domestic battery conviction and two rape convictions;
>
> II. Whether the trial court abused its discretion in sentencing Karr;
>
> III. Whether the trial court erred when it found that Karr received effective assistance from trial counsel and, therefore, denied Karr's request for a new trial; and
>
> IV. Whether the post-conviction court erred when, by summary denial, it denied Karr's petition for post-conviction relief on the basis that his claims of ineffective assistance of counsel were barred by *res judicata*.

[3] We affirm.

## Facts and Procedural History

[4] In May 2015, Karr and his then-girlfriend, A.P., along with her three children ("Children"), ages six, five, and three years old, were living in a residence that

---

administration of justice."). The procedure is useful where a defendant needs to develop an evidentiary record to support a claim of ineffective assistance of trial counsel. *Talley*, 51 N.E.3d at 303.

Karr and A.P. leased. Karr and A.P. shared a bedroom that was located off the same hallway as a bedroom that the three Children shared. On the evening of May 5, 2015, A.P. was home with the Children, and she put them to bed around 8:00 p.m. As A.P. left the Children's room and closed the door behind her, Karr came home from work. He was "agitated" and asked her what she was doing. *Tr. Vol. II* at 35. He walked from the front door to the back door and looked outside, and he accused her of having someone in the house before he got home. She told him that was not the case, and he became angry and took her phone from her as she sat on the living room couch, which according to A.P. was positioned right next to the opening to the hallway, leading to the Children's bedroom. Karr believed that A.P. was lying, and his voice got louder as he accused her. He asked her "to deny it again[,]" and when she did, he hit her across the cheek with an open hand. *Id.* at 38. He pulled her off the couch by her hair, and she fell to the floor. Karr then told A.P. to get up, saying that she was going to "suck his dick" every day and every night. *Id.* at 39.

[5]     At some point, A.P.'s oldest child ("Child") came out of her bedroom, and as she opened the door, Karr went into the hallway and confronted her. Child said she needed to go to the bathroom, and Karr told her "no" and to go back to bed. A.P. heard Child begin to cry as she went back into the bedroom, and Karr closed the door. He returned to A.P., who had gotten herself up from the floor and was on the couch. He unbuckled his pants, and A.P. put her feet up "and tried to kick him away" from her. *Id.* at 40. At that point, A.P. began to

have abdominal pains from a preexisting ovarian cyst condition, so A.P. told Karr that she needed to call her doctor.

[6] He initially refused, but he eventually agreed to let her call her doctor or go to the emergency room. After A.P. vomited in the bathroom, Karr woke the Children and told them they were all leaving and taking A.P. to the hospital. At A.P.'s request, they dropped the Children off at A.P.'s parents' home on the way. When A.P. was asked at trial if, when they dropped off the Children at her parents' house, she had told her parents that Karr had beaten her and pulled her hair, A.P. explained that she did not, because at that time her "main focus was getting the kids away from [Karr] and . . . getting them someplace safe." *Id.* at 42. She feared that saying anything would put herself and the Children in "more danger." *Id.* Once at the hospital, she and Karr walked to the registration area, and A.P. suggested to him that he go and park the car, and when she "felt he was out of earshot," she told the nurse, "I need you to get a police officer because he's hitting me." *Id.* at 43-44. Karr returned, and they sat together in an examination room, but then the nurse told Karr that A.P. needed an ultrasound and he could not go, so she left and went to an ultrasound room, where Officer Craig Denison ("Officer Denison") of the Noblesville Police Department ("NPD") was waiting for her.

[7] A.P. told Officer Denison what had happened, and he took some pictures. She also removed from her pocket and showed Officer Denison hairs that had come loose and fallen out of her head when she was on the couch and Karr was telling the Child to go back to bed. Officer Denison advised A.P. that he did

not believe he could make an arrest of Karr at that time because there was no immediate bleeding or bruising, but he offered to speak to Karr and to drive A.P. home or wherever she needed to go. Believing that Karr had calmed, and deciding "it would be better to just go home and . . . deal with everything the next morning[,]" A.P. went back home with Karr. *Id.* at 48-49. A.P. called her parents to let them know "what was going on" with her trip to the emergency room,[4] and because it was so late, after midnight, the Children stayed with A.P.'s parents. *Id.* at 49.

[8] When A.P. and Karr arrived home, she went into the bathroom to get ready for bed and put on pajamas, and he went to the kitchen. He became angry that she had purchased "the wrong orange juice" and told her that she "needed to be doing what he told [her] to do." *Id.* at 51. He hit her across her face, and she fell on the hallway floor. Karr took off his pants and underwear and told her she was going to "suck his dick." *Id.* at 52. He forced himself into her mouth, but at some point stopped and "lectured" her about the rules he was setting for her. *Id.* at 53. Eventually, Karr said he wanted to go to bed, so A.P. got into bed. When he came into bed, he said he needed to masturbate. According to A.P., he searched his phone for a pornographic video and told her to put her hand on his penis. She complied because "every time I told him no[,] I was either hit or forced to do something anyway[.]" *Id.* at 54. He later asked her to

---

[4] We note that, after talking to Officer Denison, but before leaving the hospital, A.P. received an ultrasound associated with the cysts.

perform oral sex, which she did "[o]ut of fear of what would happen if I said no." *Id.* During this time, she saw a light behind her; she turned her head and saw it was his cell phone "so I assumed he was taking a video." *Id.* at 55. Karr ejaculated on A.P., and both of them fell asleep.

[9] Karr went to work the next day, and, after she showered, A.P. went to a doctor's appointment. At her appointment, the doctor had already received record of A.P.'s emergency room visit. The doctor asked A.P. to tell her "what had happened," referring to the situation with Karr. Officer Michael Boudreau ("Officer Boudreau") of NPD came and met A.P. at the doctor's office, and at A.P.'s request, an advocate from Prevail, a victim's assistance agency, also met with A.P. to help her prepare a request for a protective order. A.P did not go home after the appointment because she was admitted to the hospital for pain associated with the ovarian cysts. A.P. called her parents and asked her mother to take the Children "someplace away from the house" and asked her father to pick up her car from the hospital. *Id.* at 58. Meanwhile, Karr and A.P. exchanged some casual text messages throughout the day. However, Karr became angry when A.P. stopped responding to him. Officer Boudreau prepared a probable cause affidavit, and Karr was arrested during a traffic stop.

[10] Before being released from the hospital, A.P. met with a forensic nurse, who examined her, and took pictures of areas where Karr had hit A.P. and pulled her hair. After being discharged, A.P. met with Detective Michael Haskett ("Detective Haskett") of NPD. Within the next week or two, A.P. and her Children were interviewed by Indiana Department of Child Services ("DCS").

[11]  On May 28, 2015, the State filed an amended information charging Karr with Counts 1 through 5, as follows: Count 1, Level 6 felony domestic battery; Count 2, Level 3 felony rape; Count 3, Level 3 felony rape; Count 4, Level 6 felony strangulation; and Count 5, Level 6 felony intimidation. A jury trial was conducted on the charges in August 2016.

[12]  A.P. was the first witness. She described the layout of the home where she, Karr, and the Children resided. She said that the bedroom she shared with Karr and the Children's bedroom were both located off "a very small hallway," were "maybe six feet apart" in the hall, and, generally, she would be able to hear the Children talking in their room after she put them to bed in the evenings. *Tr. Vol. II* at 34. As to the night in question, she described that Karr believed she had secretly had someone else in the house right before he got home and sent the person out the front door as he came in the back. He became very angry at her, and, after he first hit her, he "continued to hit [her] several times again, both with an open hand and with a closed fist" on both sides of her face and on her head. *Id*. at 39. She said that when he pulled her off the couch by her hair, "It hurt a lot. I could feel and hear hair ripping out of my head." *Id*. A.P. said that she was on the floor, kneeling in front of the couch, when her oldest Child came out of her room, and Karr went and told Child to go back to bed. A.P. described that Child's voice sounded "timid and a little scared." *Id*. at 40. A.P. explained that she went home from the hospital later that night with Karr because "I was looking for some kind of protection and if he wasn't going to be arrested at that point then I felt that my only other

course of action would be to file for a protective order and I wasn't going to be able to do that until the next morning[.]" *Id*. at 49.

[13] A.P. stated that the trip home from the hospital was uneventful, but that, when they got home, Karr became angry that she got the wrong juice and demanded that she perform oral sex on him. When she tried to avoid it, he threatened to carve "C-U-N-T" into her forehead. *Id*. at 52. She described that she was crying and choking and gagging when he forced his penis in her mouth. *Id*.

[14] On cross examination, defense counsel asked A.P. why she went home with Karr that night from the hospital after he had beaten her and why she did not leave once he fell asleep. She explained that she went home with him so that he would not know she had told her story at the hospital or to a police officer and that she planned to seek a protective order the next day. She said she did not leave after he fell asleep because she was afraid of waking him or of him following her. She did not go to a neighbor's house because she did not know her neighbors. She was asked, and denied, that at any time she removed her hair from either the shower drain or her hair brush.

[15] Among other witnesses, Officers Denison and Boudreau also testified for the State. Officer Denison testified to meeting with A.P. at the hospital when she was in the E.R. He did not observe any injuries to her at that time, but noted that "sometimes bruises, scratches, abrasions, swelling doesn't show up until a later date." *Id*. at 154. Officer Denison characterized her demeanor as serious, but she was "not frantic or crying." *Id*. at 147. According to Officer Denison,

A.P. did not want him to speak with Karr or her Children, telling him that she "didn't believe that her kids had witnessed any of the actual assault that occurred," and "it was just the verbal part that they had witnessed or heard." *Id.* at 150. He stated that A.P. seemed fearful or had concerns about possessing the Prevail documents that he had given her, which he found was not unusual in cases of domestic abuse. A.P. told Officer Denison she planned to obtain a protective order the next day.

[16] Officer Boudreau testified that he was dispatched to the hospital on May 6, 2015, to take a report of a sexual assault. A Prevail representative was also present during his interview with A.P. He did not observe any injuries to A.P. and did not collect evidence from her. He was aware of a sexual assault examination being conducted later in the day, and the following day, Officer Boudreau wrote a probable cause affidavit for Karr's arrest.

[17] Forensic nurse examiner Nakia Bowens ("Bowens") testified that she examined A.P. on May 7, 2015. She described A.P. as calm at times, but "tearful" at other times. *Id.* at 182. She observed "redness and tenderness" in A.P.'s scalp area and tenderness on her jawbone and redness to her chin, and an injury to the inside of her lip. *Id.* at 185-86, 190-91, 203. She also had petechiae, or "small red dots that indicate blood has burst," on the roof of her mouth. *Id.* at 191. One of the causes of petechiae is blunt force trauma. *Id.* at 191-92. Bowens testified that a penis striking the roof of the mouth could cause petechiae. Pictures taken of A.P. by Bowens were admitted into evidence.

[18] Detective Haskett met with A.P. on May 8 at the police station to get a formal statement from her. He described her demeanor as "collected and matter-of-fact," but tearful at times. *Id.* at 215. He did not observe any injuries to her at that time. *Id.* at 221. Sergeant Matt McGovern ("Officer McGovern") of NPD testified that, pursuant to a search warrant, he conducted a forensic analysis of Karr's cell phone. Officer McGovern testified that "sometimes" law enforcement is able to retrieve deleted content, but it depends on the make and model of the cell phone. *Id.* at 226.

[19] At the conclusion of the presentation of the State's evidence, Karr moved for and was granted a directed verdict on Count 5, Level 6 felony intimidation. *Id.* at 242. Thereafter, the defense presented the testimony of DCS employee Marshall Despain ("Despain"). In May 2015, Despain was an assessment worker, who was assigned to investigate allegations of domestic violence between A.P. and Karr and determine "how it affected the [C]hildren." *Tr. Vol. III* at 3. Despain testified to interviewing A.P. in May 2015, then consulting with law enforcement, reviewing reports, and interviewing the Children. He also tried to contact Karr for an interview. DCS ultimately determined that the report "was unsubstantiated against both [A.P.] and [] Karr[,]]" meaning that there was no evidence that the Children were affected or had "any knowledge of anything every happening between them[.]" *Id.* at 2-3. He explained that his purpose was not to determine if something happened between the parents; he was to assess if the Children were affected and to make sure they were safe.

[20]    At the conclusion of the trial, the jury returned verdicts of guilty on Count 1, Level 6 felony domestic battery, Count 2, Level 3 felony rape, and Count 3, Level 3 felony rape; it returned a verdict of not guilty on Count 4, strangulation.

[21]    The parties appeared on September 2, 2016, for a sentencing hearing, but by that point, Karr's trial counsel, Joshua Taylor ("Taylor"), had filed a motion to withdraw. Karr appeared in person at the September 2 hearing, along with Taylor and replacement defense attorney Jane Ruemmele ("Ruemmele"), who sought leave to file an appearance for Karr and a continuance of the sentencing hearing. *Id.* at 78. The trial court granted both Taylor's request to withdraw and Karr's request to continue the sentencing hearing.

[22]    The day before the scheduled September 2 sentencing hearing, Karr also had filed a motion for a new trial based upon ineffective assistance of trial counsel. Ruemmele noted to the court at the September 2 hearing that Karr's ineffective assistance claims were still preliminary and would later be supplemented because Karr did not yet have a copy of the trial transcript or A.P.'s medical records, including any medications A.P. was taking or had received at the E.R., which information Ruemmele argued would have been relevant to A.P.'s memory of the alleged incidents, and thus, the ineffective assistance claims would be supplemented upon review of those materials. On September 2, Karr proceeded to present Taylor's testimony relative to Karr's ineffective assistance of counsel claims as alleged in his motion for a new trial. Among other things, Taylor testified as to what medical records he requested or did not request, what witnesses he called or did not call, and why he did not explore alleged

drug use by A.P., explaining that his actions were based upon strategic decisions and assessments. He also discussed having made a motion in limine, making certain objections, and his decision not to request a mistrial at one point because he believed "things were going about as well as they could have at that point," and Taylor believed "there was a decent chance the jury would find Mr. Karr not guilty[.]" *Id.* at 97. Taylor testified that, both before and during trial, Karr and Taylor had discussed whether to have Karr testify and the risks associated with him doing so, noting his concern that having Karr testify would provide a chance for "fairly harmful" evidence to come into evidence. *Id.* at 99. In closing the hearing, the trial court directed that a trial transcript be prepared for Karr's use and review in preparing for the hearing on a motion for a new trial, and took the motion for a new trial under advisement.

[23] On September 19, 2016, the trial court conducted an additional evidentiary hearing on Karr's ineffective assistance of trial counsel claims, as alleged in his motion for a new trial, presenting testimony of: A.P.; a male neighbor; Officer McGovern; and Taylor. A.P. was questioned about what prescriptions she had filled on or before May 5, the night in question, and if she received intravenous medications while at the E.R. During her testimony, A.P. stated that she was not impaired before or during the incident and any medications taken did not affect her ability to recall the events. *Id.* at 135. When on cross-examination Karr's counsel asked A.P. why she showered before being examined by the forensic nurse, A.P. explained, "I was trying to carry on with the day as if it was normal. Also had no expectation of being examined by anyone for

anything. At that time my understanding was that nothing was going to be done and my only plan for the day was to file for a protective order." *Id*. at 132. Officer McGovern, who had conducted a forensic analysis of Karr's cell phone and recovered videos, searches, texts and other information from it, testified that he did not find any evidence of searches or viewing of pornographic videos, as A.P. had testified to at trial, and he found no videos of A.P. performing sex acts, contrary to A.P.'s testimony that she thought Karr was videotaping her when she saw his cell phone light behind her. Upon cross-examination by the State, Officer McGovern testified that he is not always able to recover deleted content from a phone. *Id*. at 141.

[24] At the conclusion of the hearing, the trial court denied Karr's motion for a new trial, and it also issued a written order, stating, "The Court being duly advised finds that the Defendant, has failed to establish that trial counsel Joshua Taylor was ineffective at trial by either error or omission or commission and has further failed to establish that any conduct by Mr. Taylor prejudiced the case of the Defendant." *Appellant's App. Vol. III* at 7.

[25] In November 2016, the trial court held a sentencing hearing, sentenced Karr to two and one-half years on the battery conviction and to fifteen years with five years suspended for each rape conviction, and ordered the sentences for the rape convictions to run concurrent with one another and consecutive to the term imposed on the battery conviction. Karr timely filed a notice of appeal.

[26] On January 6, 2017, Karr filed a *Davis/Hatton* petition with this court, seeking to suspend his initial appeal and pursue post-conviction remedies. We granted his request, and, on March 3, 2017, Karr filed a petition for post-conviction relief, alleging that Taylor, his trial counsel, was ineffective by: (1) failing to use phone records that showed that Karr's phone did not contain photos or videos of A.P. performing oral sex, although A.P. testified that Karr may have been photographing or videotaping her; (2) failing to use phone records that showed that Karr's phone did not contain evidence that he accessed pornographic sites, although A.P. had testified that he searched for pornography when she told him she did not want to engage in oral sex; (3) failing to obtain medical records of A.P. to discover whether she had been administered anesthesia at the E.R. in the hours prior to the alleged acts that formed the basis of the rape charges; (4) failing to obtain A.P.'s prescription records to determine if she had filled a prescription for narcotics the same day as the alleged battery; (5) failing to offer during trial text messages showing conversations between Karr and A.P. that indicated A.P had filled a prescription for Narco on May 5, 2015; (6) failing to offer at trial a text message sent by A.P. to someone, in which she stated that she had received an IV and felt better, which Karr asserted "establish[es] that she was under the influence of narcotics." *Appellant's App. Vol. IV* at 3-4.

[27] After filing his motion for post-conviction relief, Karr filed a motion for change of judge, which was granted on March 20, 2017. In May 2017, the State filed a Motion for Summary Denial of Karr's petition for post-conviction relief, asserting that the claims raised in Karr's petition had already been litigated and

adjudicated by the trial court pursuant to Karr's motion for new trial. *Id*. at 18-22. Following briefing, the post-conviction court granted the State's request and issued an order on June 13, 2017. The order stated that evidence was heard during two hearings on Karr's motion for a new trial that alleged ineffective assistance of counsel, and the post-conviction court's order further stated, in part:

> 13. Although the Petitioner has abandoned two grounds of alleged ineffectiveness of counsel originally raised in the trial court, the allegations now raised in the Petitioner's Petition for Post-Conviction Relief are otherwise the same. All of the grounds alleged in the pending Petition were directly argued, were available to be argued from the evidence and/or were available to be raised at the time of the hearing on Petitioner's Motion for a New Trial.

> 14. In his Motion for a New Trial, the Petitioner sought to have his convictions for Domestic Battery and Rape vacated based upon the alleged ineffective assistance of counsel. This is the exact same relief requested in the Petitioner's Petition for Post-Conviction Relief, and that relief is sought based upon the exact same grounds that were raised or could have been raised and determined under Petitioner's Motion for a New Trial.

> 15. Finally, and most obviously, the parties to the controversy in the current matter are the same as those who were the parties to the original criminal case.

> 16. A court may grant a motion by either party for summary disposition of a petition for post-conviction relief when it appears that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

> 17. In this case, there is no genuine issue of material fact because the evidentiary issues now raised by the Petitioner have already been heard and decided against Petitioner in the original trial court.

*Id*. at 129-132. Karr filed a motion to reconsider, which the post-conviction court denied. Karr now appeals.

# Discussion and Decision

## I. Sufficiency of the Evidence

[28] Karr contends that the State presented insufficient evidence for the jury to conclude that he was guilty of domestic battery and two counts of rape.[5] Our standard of review is deferential to the factfinder, and we consider only the evidence and reasonable inferences most favorable to the convictions, neither reweighing evidence nor reassessing witness credibility. *Taylor v. State*, 86 N.E.3d 157, 163 (Ind. 2017). We will reverse only if no reasonable factfinder could find the defendant guilty. *Id*. at 164. The evidence is not required to overcome every reasonable hypothesis of innocence and is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

---

[5] We note that in both his issue statement and his argument section, Karr claims that his "conviction" (singular) is not supported by sufficient evidence, which suggests to us that he is appealing only one conviction. *Appellant's Br*. at 2, 41. However, Karr later urges in his brief that, for the reasons argued, we vacate his "convictions" (plural). *Id*. at 44. We thus infer that he is challenging the sufficiency of the evidence as to all three of his convictions.

[29] To prove Karr committed Level 3 felony rape, the State was required to present sufficient evidence that he caused A.P. to "perform or submit to other sexual conduct" when she was "compelled by force or imminent threat of force[.]" Ind. Code § 35-42-4-1(a)(1). Indiana Code section 35-31.5-2-221.5 defines "other sexual conduct" as "an act involving ... a sex organ of one person and the mouth or anus of another person." Karr argues, "There was no forensic evidence establishing that a sex act occurred[,]" noting that officers did not observe physical injuries, Officer McGovern did not find pornographic videos on Karr's phone, nor any videos or pictures of A.P. performing oral sex. *Appellant's Br*. at 20.

[30] We reject Karr's argument. First, it ignores that nurse Bowens found evidence of physical injuries to A.P., including an injury to the inside of her lip and petechiae on the roof of A.P.'s mouth, and Bowens testified that a penis striking the roof of the mouth could cause petechiae. Second, there does not need to be "forensic evidence establishing that a sex act occurred" to support the convictions. "A rape conviction may rest solely on the uncorroborated testimony of the victim." *Carter v. State*, 44 N.E.3d 47, 54 (Ind. Ct. App. 2015) (citing *Potter v. State,* 684 N.E.2d 1127, 1136 (Ind. 1997)).

[31] Karr also contends that, as to the Level 6 felony domestic battery conviction, there was no evidence that any battery occurred within the presence of a child.[6]

---

[6] Pursuant to the version of Indiana Code section 35-42-2-1.3, under which Karr was charged and convicted, the offense of domestic battery is a Class A misdemeanor, but becomes a Level 6 felony, "if the person who

Indiana courts have recognized, "[T]he critical question in determining whether a child is 'present' for purposes of the statute is whether a reasonable person would conclude that the child might see or hear the offense; not whether the child is in the same room as where the offense is taking place." *Manuel v. State,* 971 N.E.2d 1262, 1270 (Ind. Ct. App. 2012); *see also True v. State*, 954 N.E.2d 1105, 1111 (Ind. Ct. App. 2011) ("presence" for purposes of Indiana Code section 35-42-2-1.3(b)(2) is "defined as knowingly being within either the possible sight or hearing of a child").

[32] In support of his position, Karr points to the fact that A.P. had already put the Children to bed in their own bedroom by the time he came home on the night in question. Karr also notes that A.P. told Officer Denison that she did not think that the Children had witnessed the battery. *Tr. Vol. II* at 150. However, the inquiry is not whether any of the Children *witnessed* the battery; it is whether it was committed in their presence, including within their possible hearing. Here, Officer Denison's testimony was that A.P. told him that she "didn't believe that her kids had witnessed any of the actual assault that occurred," and "it was just the verbal part that they had witnessed or heard." *Id.* Further, the State presented evidence that (1) the couch was positioned next to the "very small hallway" off of which the Children's bedroom was located, and (2) A.P. generally could hear the Children talking after she put them to bed in the

---

committed the offense . . . committed [it] in the physical presence of a child less than sixteen years of age, knowing that the child was present and might be able to see or hear the offense."

evenings, allowing the inference that they, too, could hear what was happening outside of their room. *Id.* at 34. Evidence was also presented that, during the time that Karr was yelling at A.P. and telling her to "suck his dick," the oldest Child opened her bedroom door. Karr confronted Child at her door and told her to go back to bed, at which point A.P. heard Child begin to cry and go back into her own bedroom. *Id.* at 39. Based on the record before us, we find that the State presented sufficient evidence from which the jury could reasonably infer that the battery was committed within the presence of a child.

[33] Karr also argues that A.P.'s testimony as to the battery and the rape allegations is not to be believed because she was questioned about, but could not recall, certain details before, during, and after, the incidents, including whether she was taking pain medication(s), if she had filled a certain prescription, or for what period of time the incidents lasted. *Appellant's Br.* at 41-42. Karr asserts, "Her lack of memory could have been that she consumed drugs that day, was administered drugs that day, or both, or was simply fabricating the events." *Id.* at 43. He argues that her testimony showed that "she had significant deficiencies in her ability to recall the details of her allegations," and her testimony was incredibly dubious and should not be believed. *Id.*

[34] The incredible dubiosity rule allows an appellate court to impinge upon the fact-finder's assessment of witness credibility when the testimony at trial was so "unbelievable, incredible, or improbable that no reasonable person could ever reach a guilty verdict based upon that evidence alone." *Moore v. State,* 27 N.E.3d 749, 751 (Ind. 2015). Incredible dubiosity is a difficult standard to

meet, requiring ambiguous, inconsistent testimony that "runs counter to human experience." *Carter,* 44 N.E.3d at 52. Our Supreme Court has reiterated the limited scope of the rule and set out three requirements for its application: (1) a sole testifying witness; (2) testimony that is inherently contradictory, equivocal, or the result of coercion; and (3) a complete absence of circumstantial evidence. *Moore,* 27 N.E.3d at 756.

[35] Here, A.P. related her version of events to at least the following: Officer Denison at the E.R., her doctor the next day, Officer Boudreau, a victim's advocate from Prevail, Detective Haskett, and nurse Bowens. Her testimony was not inherently contradictory or equivocal, and there is no evidence or assertion that it was the result of coercion. Thus, the incredible dubiosity rule is inapplicable. Further, the rule requires a complete absence of circumstantial evidence. In this case, Bowens testified to the injuries that she observed to A.P.'s scalp, lip, and mouth, which were consistent with A.P.'s description of what happened with Karr. Karr's claim that A.P.'s testimony was not credible is a request for us to reweigh the evidence, which we cannot do on appeal. *Carter*, 44 N.E.3d at 54. The State presented sufficient evidence to sustain Karr's three convictions.

## II. Sentencing

[36] Karr challenges his sentence of an executed twelve and one-half years, claiming it is excessive, and he asks us to remand for a new sentencing hearing or, alternatively, reduce it. Initially, we note that Karr makes the assertion that his sentence "is inappropriate in light of the nature of the offense and [his]

character[,]" *Appellant's Br.* at 46, but he does not specifically make any argument or analysis as to either the nature of the offense or the character of the offender. Thus, he has waived any inappropriateness argument under Indiana Appellate Rule 7(B). *Perry v. State*, 921 N.E.2d 525, 528 (Ind. Ct. App. 2010) (failure to make cogent argument regarding the nature of defendant's offense and defendant's character results in waiver of appropriateness claim).

[37] Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal for an abuse of discretion. *Kubina v. State*, 997 N.E.2d 1134, 1137 (Ind. Ct. App. 2013). A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Anglemyer v. State*, 868 N.E.2d 482, 490, *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). A trial court may be found to have abused its discretion by failing to enter a sentencing statement at all; entering a sentencing statement that explains its reasons for imposing a sentence where such reasons are not supported by the record or are improper as a matter of law; or entering a sentencing statement that omits reasons which are clearly supported by the record and advanced for consideration. *Id*. at 490-91. "[R]egardless of the presence or absence of aggravating or mitigating circumstances, a trial court may impose any sentence authorized by statute and permissible under the Indiana Constitution." *Kubina*, 997 N.E.2d at 1137 (citing Indiana Code section 35-38-1-7.1, providing non-exhaustive list of aggravating and mitigating circumstances court may consider).

[38]    The range of penalties for a Level 6 felony is a fixed term of between six months and two and one-half years, with the advisory sentence being one year. Ind. Code § 35-50-2-7. The range of penalties for a Level 3 felony is a fixed term of between three and sixteen years, with the advisory sentence being nine years. Ind. Code § 35-50-2-5. Here, Karr received two and one-half years on the domestic battery conviction and fifteen years, with five years suspended, on each of the rape convictions. In sentencing Karr, the trial court found as aggravating factors that Karr had a history of criminal behavior and that his record reflected that he engaged in what the trial court termed a "pattern" of similar behavior, committing a battery after a breakup or as a relationship was ending. *Tr. Vol. III* at 232-33. The trial court recognized as mitigating that his incarceration would result in unusual circumstances and hardship for his parents, who relied on him for financial support.

[39]    On appeal, Karr argues that the trial court should also have recognized as a mitigating circumstance that he suffered multiple concussions in his life. The record reflects that, at the sentencing hearing, Karr's parents testified that Karr suffered a concussion on four occasions, and they described that he had resulting dizziness, memory issues, and increased agitation or frustration. No medical evidence was presented, nor any suggested connection as to how those concussions affected his actions on the day in question. It is well recognized that a trial court is not obligated to find a circumstance mitigating because it is advanced as such by the defendant. *Weedman v. State*, 21 N.E.3d 873, 893 (Ind. Ct. App. 2014), *trans. denied.* Karr also takes issue with the fact that the trial

court stated, "[Y]ou are guilty of having raped . . . [A.P.] . . . and having battered her rather severely in the presence, physical presence of her daughter. These are serious crimes." *Tr. Vol. II* at 233. He urges that there was no evidence of "severely" beating A.P., and the trial court erred when it used that circumstance as an aggravator. Upon review of the record, we find that, contrary to Karr's claim, the trial court did not use this as an aggravator, and, rather, as the State suggests, it was a comment that was part of the court's discussion of the jury's verdict. The trial court did not rely on the severity of the battery as an aggravating circumstance. Karr has failed to establish that the trial court abused its discretion when it sentenced him.

## III. Ineffective Assistance of Trial Counsel

[40] Karr claims that the trial court erred when it determined that he did not receive ineffective assistance of trial counsel and, so finding, denied his motion for a new trial, which sought relief on that basis. To succeed on a claim of ineffective assistance of counsel, a petitioner must show not only that his trial counsel's representation fell below an objective standard of reasonableness, but also that the deficient performance resulted in prejudice. *Manzano v. State*, 12 N.E.3d 321, 325 (Ind. Ct. App. 2014) (quoting *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001)) (quotations omitted), *trans. denied, cert. denied* 135 S. Ct. 2376 (2015). To establish prejudice, a petitioner must show that counsel's errors were so serious as to deprive him of a fair trial because of a reasonable probability that, but for counsel's unprofessional errors, the result would have

been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

[41] There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* Counsel is afforded considerable discretion in choosing strategy and tactics, and these decisions are entitled to deferential review. *Id.* Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Id.* at 325-26. We do not second guess counsel's strategic decisions requiring reasonable professional judgment even if the strategy or tactic, in hindsight, did not best serve the defendant's interests. *Elisea v. State,* 777 N.E.2d 46, 50 (Ind. Ct. App. 2002). If it is easier to dispose of an ineffectiveness claim by analyzing the prejudice prong alone, that course should be followed. *Manzano*, 12 N.E.3d at 326.

[42] Karr asserts that, at trial, "defense counsel's theory was that the allegations were fabricated[,]" and "Thus, it was incumbent on trial counsel to present all readily available sources of evidence to prove that these event[s] did not occur." *Appellant's Br.* at 31. Karr maintains that Taylor should have but failed to present evidence of drug consumption by A.P. at or near the time of the incidents, through investigation and discovery of medical information such as A.P.'s prescriptions that she was taking or had been prescribed or the E.R. records on the night in question. He suggests that if the jury knew of A.P.'s prescribed pain and anxiety medication, trial counsel could have effectively

impeached her regarding her ability to remember and recount the events in question.

[43] At the hearing on Karr's motion for a new trial, Taylor was asked about why he "did not explore [A.P.'s] drug use prior to or during the first offense[,]" and he replied that Karr would be the only person who would have been able to testify to that, and Karr did not testify. *Tr. Vol. II* at 97. Karr argues that Taylor could have requested her prescription medication or "asked A.P. when she testified." *Appellant's Br*. at 33. A pharmacy bag was admitted during the hearing on Karr's motion for a new trial indicating that A.P. filled a prescription for Narco on May 5, 2015. Also admitted at the hearing were medical records from A.P.'s doctor's visit on May 7, 2015, which reflected that A.P. reported taking hydrocodone. *Tr. Vol. III* at 122; *Ex. Vol. IV* at 122. Karr urges that "[t]he jury never heard this evidence because trial counsel did not present it." *Appellant's Br.* at 34.

[44] Effective representation requires adequate pretrial investigation and preparation, but we resist judging an attorney's performance with the benefit of hindsight. *McKnight v. State,* 1 N.E.3d 193, 200 (Ind. Ct. App. 2013). Accordingly, when deciding a claim of ineffective assistance for failure to investigate, we give a great deal of deference to counsel's judgments. *Id.* at 201. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. *Id.*

In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Id.*

[45] Here, A.P. testified at the hearing that she may have filled a prescription earlier in the day, but did not recall for certain if or where she did so, and she testified that she was not impaired due to drug consumption and her memory was not affected by any medication. A.P.'s testimony was clear and detailed, and there was no evidence suggesting she did not remember the events in question. She was consistent with what she told Officer Denison at the E.R. that night, and there was no evidence that she exhibited signs of impairment. Karr has failed to show that he was prejudiced by Taylor's decision not to obtain and present medical records evidence concerning any drugs A.P. may have consumed prior to the domestic battery.

[46] Karr also asserts that trial counsel should have obtained medical records from the E.R. as to what medications she received at the hospital, as that would have affected her memory of what happened thereafter, including the forced oral sex supporting the rape charges. He argues, "Whether she was under the influence of anesthesia and dreaming or imagining the events was important to explore" and "had trial counsel properly impeached her with her drug consumption of opiates and anesthesia administered at the ER . . . the outcome would have been different." *Appellant's Br* at 33, 43. Initially, we note that there is no evidence in this record that A.P. was given "anesthesia" at any point. Upon Karr's questioning at the hearing on his motion for a new trial, A.P.

acknowledged that she sent a text while at, or before leaving, the hospital to someone, stating "I got an IV for meds so I'm feeling a lot better." *Tr. Vol. III* at 124. However, she also stated, "I'm not sure whether I actually received the IV medications or if I just told him that." *Id*. Furthermore, A.P. testified that at no time was she impaired, and she had no issues with remembering what Karr did to her. As the State observes, "[T]he totality of the evidence . . . supports only that A.P. was clear of thought and speech at all relevant times[,]" including in her interviews with nurse Bowens, who characterized A.P. as calm but tearful at times, with Officer Denison, who described her as calm and composed but concerned, and Detective Hackett, who said she was "matter of fact" but sometimes would "tear up" while describing what happened. *Appellee's Br.* at 30; *Tr. Vol. II* at 146-47, 160, 182, 214-15. Furthermore, Taylor testified at the hearing that it was his strategic decision not to obtain the records. *Tr. Vol. III* at 124. Karr has failed to show that Taylor's tactical decision to not try to obtain A.P.'s prescription and medical records, which may or may not have been discoverable or admissible,[7] was unreasonable or that Karr was prejudiced by trial counsel's choice.

[47] On appeal, Karr also contends that Taylor was ineffective for failing to present to the jury that Officer McGovern conducted a forensic analysis of Karr's

---

[7] "To make a sufficient showing that [rape victim's] prescription drug records were discoverable, [the defendant] must demonstrate that his request was particular and material." *Williams v. State*, 819 N.E.2d 381, 386 (Ind. Ct. App. 2004), *trans. denied*. "[W]hile generally evidence of drug use may be excluded at trial, evidence of drug use affecting a witness's ability to recall underlying events is admissible." *Id*.

phone, but did not find any evidence that Karr (1) had accessed pornographic videos, as A.P. had stated in her testimony, and (2) had photographed or videotaped A.P., as she suspected when she saw the light of his phone behind her. He argues, "Trial counsel never presented this affirmative evidence to the jury[,]" which "was in the possession of the State and readily available," and it "showed that A.P.'s story could not be corroborated." *Appellant's Br.* at 38.

[48] As an initial matter, we disagree that A.P.'s story "could not be corroborated"; as discussed above, the injuries and redness observed by nurse Bowens were consistent with the reports that A.P. made to police. Regardless, even if the trial counsel had presented the evidence, and the jury was persuaded that A.P. was incorrect when she said that Karr was viewing pornography and recording her acts with his cell phone, such evidence would not necessarily undermine her account of the incidents, *i.e.*, Karr has not established that he was prejudiced by the failure to present the cell phone evidence.

[49] We further note that Karr was charged with five counts. Taylor successfully argued for and received a directed verdict on one count and successfully received an acquittal on one of the remaining counts. Several pieces of evidence were excluded from evidence based upon Taylor's objections, and he thoroughly cross-examined witnesses, including A.P. We conclude that Karr has not established either deficient performance or prejudice stemming from trial counsel's representation. The trial court correctly determined that Taylor had not provided ineffective assistance and, therefore, appropriately denied Karr's motion for a new trial.

# IV. Denial of Post-Conviction Relief

After the trial court denied his motion for a new trial, Karr filed a notice of appeal with this court, which pursuant to his request, we dismissed without prejudice, allowing him to file a petition for post-conviction relief, which he did, also requesting and receiving a change of judge. The State filed a motion for summary denial of Karr's petition for post-conviction relief, which motion the trial court granted on the basis that Karr was raising the same ineffective assistance of counsel claims that that he had asserted in his motion for a new trial – which had already been heard and decided – such that his post-conviction claims were barred by *res judicata*. Karr asserts that the post-conviction court's denial of his petition was erroneous and asks us to vacate the decision and remand to the post-conviction court for a hearing.

A petitioner seeking post-conviction relief bears the burden of establishing grounds for relief by a preponderance of the evidence. Post-Conviction Rule 1(5). A post-conviction court is permitted to summarily deny a petition for post-conviction relief if the pleadings conclusively show the petitioner is entitled to no relief. P-C.R. 1(4)(f). "'An evidentiary hearing is not necessary when the pleadings show only issues of law; [t]he need for a hearing is not avoided, however, when a determination of the issues hinges, in whole or in part, upon facts not resolved.'" *Kuhn v. State*, 901 N.E.2d 10, 13 (Ind. Ct. App. 2009) (quoting *Godby v. State*, 809 N.E.2d 480, 482 (Ind. Ct. App. 2004), *trans. denied*). On appeal, "A petitioner who is denied post-conviction relief appeals from a negative judgment, which may be reversed only if the evidence as a whole leads

unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Collins v. State*, 14 N.E.3d 80, 83 (Ind. Ct. App. 2014).

[52] Karr's petition for post-conviction relief asserted that Taylor provided ineffective assistance in the following summarized ways: (1) he failed to offer at trial phone records showing that Karr's phone (a) did not contain photos or videos of A.P. during the oral sex and (b) did not contain evidence that he accessed pornographic sites; (2) he failed to obtain medical records of A.P. to discover whether she had been administered anesthesia at the E.R. and failed to obtain A.P.'s prescription records to determine if she had filled a prescription for narcotics the same day as the alleged battery; and (3) he failed to offer at trial a text message written by A.P. showing that (a) she filled a prescription for Narco on May 5, 2015, and (b) she sent a text message to someone from the hospital before leaving the E.R. stating that she had received an IV and felt better. *Appellant's App. Vol. IV* at 3-4.

[53] The post-conviction court determined that these issues were litigated at the two hearings on Karr's motion for a new trial and were barred by claim preclusion. *Id.* at 130. We agree. "'*Res judicata*, whether in the form of claim preclusion or issue preclusion (also called collateral estoppel), aims to prevent repetitious litigation of disputes that are essentially the same, by holding a prior final judgment binding against both the original parties and their privies.'" *M.G. v. V.P.*, 74 N.E.3d 259, 264 (Ind. Ct. App. 2017) (quoting *Becker v. State*, 992 N.E.2d 697, 700 (Ind. 2013)). "'Claim preclusion applies when the following four factors are present: (1) the former judgment was rendered by a court of

competent jurisdiction; (2) the former judgment was rendered on the merits; (3) the matter now at issue was, or could have been, determined in the prior action; and (4) the controversy adjudicated in the former action was between parties to the present suit or their privies.'" *Id.* (quoting *Dawson v. Estate of Ott*, 796 N.E.2d 1190, 1195 (Ind. Ct. App. 2003)). When claim preclusion applies, all matters that were or might have been litigated are deemed conclusively decided by the judgment in the prior action. *Id.*

[54] Here, the record reflects that, at the first hearing on Karr's motion for a new trial, held on September 2, 2016, Karr presented testimony from trial counsel, Taylor, and, among other things, Taylor testified as to what medical records he requested or did not request, what witnesses he called or did not call, and why he did not explore alleged drug use by A.P., explaining that his actions were based upon strategic decisions and assessments. Understanding that Karr's counsel, Ruemmele, needed a trial transcript to further explore ineffectiveness issues, the trial court scheduled a second hearing, and it directed that a trial transcript be prepared promptly for Ruemmele's use. The second hearing was held September 19, at which Karr presented the testimony of four witnesses, including A.P., who testified that she was not impaired and her memory was not affected by any medications. Officer McGovern testified that, while his forensic analysis of Karr's cell phone did not show that Karr accessed pornographic sites or had taken pictures or video of A.P., he also testified that it is not always possible to recover deleted material from a phone. Karr also presented seven exhibits, including a prescription bag from CVS pharmacy for a

hydrocodone-acetaminophen prescription for A.P. and medical records from Community North from her E.R. visit. *Ex. Vol. IV* at 119, 121-22 (*Def. Exs.* D, E).

[55] Karr refers us to the recognized principle that "[a]n issue previously considered and determined in a defendant's direct appeal is barred for post-conviction review on grounds of prior adjudication - *res judicata*[,]" and urges that, here, "Because Karr has not challenged the adequacy of his trial representation on direct appeal, his ineffective assistance claims are not waived." *Appellant's Br.* at 26-27 (citing *Conner v. State*, 711 N.E.2d 1238, 1244 (Ind. 1999), *cert. denied,* 531 U.S. 829 (2000), and *Overstreet v. State*, 877 N.E.2d 144, 178 (Ind. 2007), *cert. denied,* 555 U.S. 972 (2008)). We do not find that Karr's claims are waived; we find that his claims of ineffective assistance of counsel have already been raised, heard, and decided. To the extent that Karr is arguing that only those claims of ineffective assistance of counsel that were raised on direct appeal may be barred by *res judicata*, we disagree with his suggestion that direct appeal is the exclusive basis for rendering the ineffectiveness assistance claims barred. We find that, in the unique posture and context of this case,[8] it was not error for the post-conviction court to find that Karr was not entitled to relitigate the claims, and

---

[8] The State suggests that Karr's petition for post-conviction relief was the functional equivalent to a successive petition "because it raised only the same claims previously presented to the trial court for adjudication[,]" and our Supreme Court has explained that, "[A] defendant is entitled to one post-conviction hearing and one post-conviction opportunity to raise the issue of ineffective assistance of trial counsel in the absence of newly discovered evidence or a *Brady* violation." *Appellee's Br.* at 27 (citing *Daniels v. State*, 741 N.E.2d 1177, 1184-85 (Ind. 2001)). Our holding today is consistent with the Supreme Court's reasoning.

we find no error with its decision to grant the State's request for summary denial of Karr's petition for post-conviction relief.[9]

[56] Affirmed.

[57] Bailey, J., and Pyle, J., concur.

---

[9] We also reject Karr's claim that – due to trial counsel's alleged ineffectiveness, combined with the trial court's comment during the hearing on the motion for a new trial, where the trial court stated that it was "pretty certain" that it would not have granted any request by trial counsel for A.P.'s prescription records, *Tr. Vol. III* at 102 – he was denied his right to explore bias and motive, was thereby denied his right to confrontation and a fair trial, and was entitled to post-conviction relief. *Reply Br.* at 14.