# OPINION

.



IN THE

# Court of Appeals of Indiana

Desmond Banks,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Feb 13 2024, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

February 13, 2024

Court of Appeals Case No.
23A-CR-896

Appeal from the
Marion Superior Court

The Honorable
Marc T. Rothenberg, Judge

Trial Court Cause No.
49D29-2002-MR-6886

**Opinion by Judge Vaidik**
Judge Brown concurs.
Judge Bradford concurs in part and dissents in part,
with separate opinion.


**Vaidik, Judge.**

# Case Summary

Three defendants were tried together and convicted for a February 2020 quadruple murder in Indianapolis. One of those defendants, Desmond Banks, was only sixteen years old at the time of the shootings. The trial court sentenced him to 220 years. He now appeals, arguing, among other things, that his de facto life sentence is inappropriate.

Between 2014 and 2020, the Indiana Supreme Court reduced the life or de facto life sentences of at least five juveniles convicted of murder given their young ages and the emerging scientific research on adolescent brain development, notwithstanding the horrific nature of the crimes. Three of the five cases involved double murders. In those cases, our Supreme Court reduced the sentences so the defendants would be eligible for release in their fifties or sixties, giving them reasonable hope for rehabilitation and some life outside prison.

After those cases were decided, the Indiana General Assembly amended Indiana Code section 35-38-1-17 to provide that a defendant who was convicted of a murder committed when they were less than eighteen years old may seek to

modify their sentence after serving substantial time. Given the availability of this statute and the fact that Desmond was convicted of four murders, we reduce his sentence to 135 years. Although this is still a de facto life sentence, it gives him a more realistic chance, with good behavior, at some life outside prison in his later years should he seek to modify his sentence under Section 35-38-1-17.

## Facts and Procedural History

[4] The evidence most favorable to the verdicts is as follows. In February 2020, nineteen-year-old Jalen Roberts and twenty-year-old Marcel Wills lived at Carriage House East Apartments at 42nd Street and Mitthoeffer Road on the east side of Indianapolis. Marcel owned guns and sold marijuana. On the night of February 5, twenty-one-year-old Braxton Ford and twenty-one-year-old Kimari Hunt, who was Marcel's girlfriend, were hanging out with Jalen and Marcel at the apartment.

[5] That same night, Lasean Watkins, who was nineteen years old, called his friend, nineteen-year-old Rodreice Anderson, and asked for a ride. When Rodreice arrived at Lasean's house, brothers Cameron and Desmond Banks were with Lasean. Cameron was nineteen, and Desmond was sixteen. The three got into Rodreice's gold Oldsmobile, and Lasean told Rodreice to drive them to Jalen and Marcel's apartment so they could buy marijuana.

[6] Meanwhile, Anton Wilson and his brother Mikalus Hervey pulled up at Jalen and Marcel's apartment around 9:30 p.m. Anton went inside while Mikalus stayed in the car.

[7] Shortly before 10 p.m., Rodreice, Lasean, Cameron, and Desmond pulled up at the apartment. Rodreice stayed in his car while the other three went inside. Anton was already inside when Lasean, Cameron, and Desmond entered. Anton didn't know them but later identified them in a photo lineup as Lasean, Cameron, and Desmond. Anton noticed that Lasean had a rose tattoo on his hand and a gun at his waist. Anton also noticed that Lasean was acting "jittery" and pacing around. Tr. Vol. III p. 155. Marcel asked Lasean why he was acting that way, but Lasean didn't respond. Marcel also asked Lasean if he wanted him to buy back the gun he had sold him, and Lasean responded that it would cost more because he had modified it. The situation made Anton feel "uncomfortable," so he told Marcel that he was leaving and would see him later. *Id.* at 156.

[8] According to surveillance footage, Anton walked out of the apartment at 10 p.m. When Anton got back to his car, he saw that Lasean had exited the apartment and walked over to Rodreice, who was still sitting in his car. Lasean asked Rodreice if he had change for a $20, and Rodreice said no. According to Rodreice, Lasean told him there were "four people in the house" and he was "about to rob them." Tr. Vol. V p. 22. Rodreice stayed in his car.

[9] Anton's car pulled away as Lasean reentered the apartment. Soon after, Rodreice heard gunshots and moved his car in the parking lot so it was closer to the street. About five minutes later, Cameron got in the car shortly followed by Desmond and Lasean. Each carried a gun and a duffel bag. Rodreice drove them to Cameron and Desmond's house, and Cameron gave Rodreice a jar of marijuana.

[10] Around this time, 911 calls about shots fired started coming in. Officers from the Indianapolis Metropolitan Police Department responded to the apartment and found the bodies of Jalen, Marcel, Braxton, and Kimari inside. Jalen had been shot twenty-nine times, Marcel and Braxton had been shot seven times each, and Kimari had been shot five times. It looked like the apartment had been "ransacked," and Marcel's guns and marijuana were missing. Tr. Vol. IV p. 166.

[11] The State charged Lasean, Cameron, and Desmond each with four counts of murder, four counts of felony murder, and four counts of Level 2 felony robbery (enhanced from a Level 5 felony due to serious bodily injury). The State also charged Rodreice with four counts of felony murder and four counts of Level 2 felony robbery. Rodreice and the State entered into a plea agreement, under which Rodreice would plead guilty to the four counts of Level 2 felony robbery and the State would dismiss the four counts of felony murder. Rodreice, who agreed to testify against Lasean, Cameron, and Desmond, was sentenced to thirty-five years, with five years suspended to probation.

A five-day jury trial was held in February and March 2023. Lasean, Cameron, and Desmond were tried together. Anton and Rodreice testified as detailed above. A firearms expert testified that three different guns were used in the shootings. At the end of the second day of trial, the trial court was giving the jurors instructions for the night when it appeared that a spectator in the gallery started talking to the defendants or the attorneys. Ex. 3. Desmond and Cameron turned around, and a Marion County Sheriff's Office deputy walked toward the gallery and directed the spectator to exit the courtroom. *Id.* After the trial court said "all rise" and as the jurors started filing out of the courtroom, three members of the Marion County Sheriff's Office Critical Emergency Response Team (CERT), who had been stationed in the courtroom during the trial, approached Cameron and Desmond and stood behind them. *Id.* The CERT members, who were wearing special uniforms that resembled SWAT uniforms, told Desmond and Cameron to face forward. Desmond's attorney moved for a mistrial:

> I'm moving for a mistrial. While the jury was in the room and standing up and proceeding towards the door, members of the CERT Team came and stood behind our clients, which gives the impression that our clients are in custody and essentially supervised by the Sheriff's Office. The jurors could, and very likely would, have seen that. And that's completely inappropriate and prejudicial to our clients.

> And earlier I may have said removing. They -- they not necessarily were taking them out the door, but they were standing behind them in order to take them back into the lockup, and the jurors would've seen them standing behind them like

that. And I think that's just unduly prejudicial, and the jurors shouldn't have seen that, and so we should have a mistrial.

Tr. Vol. IV pp. 89-90. Cameron's attorney joined in the motion, adding that the CERT members' presence behind Desmond and Cameron "g[ave] the impression that they [were] dangerous." *Id.* at 90. After reviewing a video of the incident and speaking at length with the parties, the court denied the motion for mistrial. The court detailed that the video showed that the CERT members stood behind Desmond and Cameron as the jurors filed out of the courtroom. The court explained that had the CERT members led Desmond and Cameron out of the courtroom while the jurors were still present, "that would be a much different situation." *Id.* at 95. The court emphasized that the situation was precipitated by the spectator in the gallery who tried to communicate with someone at the front of the courtroom. Nevertheless, it instructed the CERT members not to approach Desmond and Cameron anymore "until the jury is out of the room." *Id.*

[13] After the trial, the jury found Lasean, Cameron, and Desmond guilty as charged.[1] At Desmond's sentencing hearing, the trial court entered judgment of conviction for the four murder counts, vacated the four felony-murder counts, and entered judgment of conviction for the four counts of Level 2 felony

---

[1] Lasean appealed his convictions and raised a single issue: the evidence is insufficient to prove that he was one of the participants. We affirmed. *See Watkins v. State*, No. 23A-CR-1109 (Ind. Ct. App. Dec. 14, 2023) (mem.), *trans. not sought*.

robbery. The trial court found that of the 100 murder trials it had presided over, this one was "the most horrific" because it involved a "slaughter" and an "execution" of the victims. Tr. Vol. VII p. 109. The court identified as aggravators the nature and circumstances of the offenses and that there were four victims.[2] The court found no mitigators. Although the court acknowledged that Desmond was only sixteen years old at the time of the shootings and that there is emerging scientific research on adolescent brain development, it didn't give his age any mitigating weight because "some things you do, you do as a man, you don't do as a kid." *Id.* at 108. The court also rejected as a mitigator that Desmond didn't have a juvenile or criminal history because he had one juvenile adjudication from 2018 for carrying a concealed weapon. The court sentenced Desmond to fifty-five years for each murder conviction, to be served consecutively, and seventeen-and-a-half years for each robbery conviction, to be served concurrently, for a total of 220 years. The court acknowledged that it was a "de facto life sentence" but found that it was warranted because this "was one of the worst things I've ever seen in my entire life." *Id.*

[14] Desmond now appeals.

---

[2] Desmond argues the trial court erroneously found as a third aggravator that his "MBK" tattoo was gang related. Although the trial court discussed Desmond's tattoo, it did not find it to be an aggravator. But even if it did and we found it to be error, our revision of Desmond's sentence corrects that.

# Discussion and Decision

## I. The trial court properly denied Desmond's motion for mistrial based on the CERT members approaching and standing behind him as the jurors filed out of the courtroom

Desmond contends the trial court erred in denying his motion for mistrial based on the CERT members approaching and standing behind him as the jurors filed out of the courtroom. "[A] mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001). Because the trial court is in the best position to gauge the circumstances surrounding an event and its impact on the jury, we afford great deference to its decision on appeal. *Id.*

Desmond says a mistrial was warranted because "[t]he CERT team's actions were a per se violation of [his] right to a fair trial" and branded him "with an unmistakable mark of guilt." Appellant's Br. pp. 20, 23 (quotation omitted). According to the Sixth and Fourteenth Amendments to the United States Constitution, a criminal defendant "is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on the grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quotation omitted). That does not mean, however, that "every practice tending to single out the accused from everyone else in the courtroom must be struck down." *Id.* Whenever a courtroom arrangement is challenged as inherently prejudicial, the question is "not whether jurors actually articulated a

consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 569 (quotation omitted). "[T]he presence of armed personnel in a courtroom is not a practice that is inherently prejudicial and must be examined on a case-by-case basis." *Holifield v. State*, 572 N.E.2d 490, 496 (Ind. 1991) (citing *Holbrook*, 475 U.S. 560), *reh'g denied*; *see also Meadows v. State*, 785 N.E.2d 1112, 1123 (Ind. Ct. App. 2003) ("[W]hile several challenges have been made to uniformed officer presence in a courtroom, few cases have reached the conclusion that such police presence has resulted in an unacceptable risk to the defendant."), *trans. denied*.

[17] We first note that the trial court found, and Desmond does not challenge on appeal, that the CERT members' presence was required during trial. Desmond suggests that the CERT members were there for Lasean, who was facing another murder charge for killing an inmate while he was in jail awaiting trial in this case. *See* Cause No. 49D31-2106-MR-17274.[3] Regardless, Desmond only challenges that the CERT members approached him and stood behind him as the jurors exited the courtroom.

[18] The CERT members' presence behind Desmond for a few moments did not result in an unacceptable risk of impermissible factors coming into play. As the trial court explained, the CERT members approached and stood behind Desmond and Cameron because of a unique sequence of events—one that

---

[3] After this trial, Lasean pled guilty to Level 3 felony aggravated battery for killing the inmate and was sentenced to five years.

evidently did not repeat itself. As Exhibit 3 shows, shortly before the CERT members approached Desmond and Cameron, a spectator in the gallery started talking to the defendants or the attorneys, and Desmond and Cameron turned around. As a sheriff's deputy removed the spectator from the courtroom, the CERT members approached Desmond and Cameron, stood behind them, and told them to face forward. The court, who was present during this incident and reviewed the video, found that the CERT members approached and stood behind Desmond and Cameron as the jurors exited the courtroom but that Desmond and Cameron were not removed from the courtroom until after the last juror had exited. Given our great deference to trial courts in ruling on requests for mistrial, *see Mickens*, 742 N.E.2d at 929, we cannot say the trial court abused its discretion here.

## II. The State concedes that three of the four robbery convictions should be vacated

[19]   Desmond next contends the evidence is insufficient to support four separate convictions for Level 2 felony robbery because he did not take property from each victim. The State concedes that only one conviction for robbery is appropriate (Count XII relating to Marcel) and that the other three convictions (Counts IX, X, and XI) should be vacated. We therefore reverse Desmond's convictions for Counts IX, X, and XI.

## III. Desmond's convictions for the murder and Level 2 felony robbery of Marcel constitute double jeopardy, so we reduce the robbery to a Level 5 felony

[20] Desmond next contends his convictions for the murder and Level 2 felony robbery of Marcel constitute double jeopardy under *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020), because the robbery was enhanced to a Level 2 felony "due to the same serious bodily injury that formed the basis" of the murder. Appellant's Br. p. 29. The State says there is no double-jeopardy violation under *Wadle*.

[21] These offenses occurred in February 2020, before *Wadle* was decided. Under pre-*Wadle* law, this was a clear double-jeopardy violation. *See, e.g., Spears v. State*, 735 N.E.2d 1161 (Ind. 2000) (holding that a robbery conviction cannot be enhanced "based on the same serious bodily injury that forms the basis of a murder conviction"), *reh'g denied*. Desmond is entitled to the benefit of the law that was in effect when he committed the offenses. *See Hessler v. State*, 213 N.E.3d 511, 528 (Ind. Ct. App. 2023) (Vaidik, J., dissenting), *trans. denied*. We therefore reverse Desmond's conviction for the Level 2 felony robbery of Marcel (Count XII) and remand with instructions for the trial court to enter conviction for Level 5 felony robbery instead.[4]

---

[4] Lasean's sentencing hearing was held after Desmond and Cameron's sentencing hearing. The trial court reduced Lasean's robbery convictions to Level 5 felonies based on double-jeopardy principles. *See Watkins*, No. 23A-CR-1109 (Tr. Vol. VII pp. 38-39).

## IV. Desmond's 220-year sentence is inappropriate, and we reduce it to 135 years

Finally, Desmond contends his 220-year sentence is inappropriate and asks us to reduce it. Indiana Appellate Rule 7(B) provides that an appellate court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The court's role under Rule 7(B) is to "leaven the outliers," and "we reserve our 7(B) authority for exceptional cases." *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019). "Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014) (citing *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008)). Because we generally defer to the judgment of trial courts in sentencing matters, defendants must persuade us that their sentences are inappropriate. *Schaaf v. State*, 54 N.E.3d 1041, 1044-45 (Ind. Ct. App. 2016).

The sentencing range for murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3(a). The trial court sentenced Desmond to the advisory sentence of fifty-five years for each murder conviction, to be served consecutively, for a total of 220 years. The court also sentenced Desmond to the advisory sentence of seventeen-and-a-half years for each Level 2 felony robbery conviction, to be served concurrently. But as just explained, we now reverse three of Desmond's robbery convictions and reduce

the fourth to a Level 5 felony. The sentencing range for a Level 5 felony is one to six years, with an advisory sentence of three years. I.C. § 35-50-2-6(b).

[24] Before addressing the nature of these offenses and Desmond's character, we set forth the inappropriate-sentence framework the Indiana Supreme Court has applied to juveniles convicted of murder. Since 2014, our Supreme Court has reduced the sentences of at least five juveniles convicted of murder due to their young ages and the emerging scientific research on adolescent brain development. In the first case, *Brown v. State*, 10 N.E.3d 1 (Ind. 2014), sixteen-year-old Martez Brown and two other teenagers (eighteen-year-old Na-Son Smith and fifteen-year-old Jacob Fuller) robbed and killed two people in 2010. Brown was convicted of two counts of murder and one count of Class B felony robbery. The trial court sentenced him to sixty-five years for each count of murder and twenty years for robbery, to be served consecutively, for a total of 150 years. On appeal, this Court found that Brown's sentence was not inappropriate even though he was "just sixteen years old" at the time of the crimes. *Brown v. State*, No. 48A02-1212-CR-1007 (Ind. Ct. App. July 30, 2013), *trans. granted*. Our Supreme Court granted transfer and reduced Brown's sentence:

> We take this opportunity to reiterate what the United States Supreme Court has expressed: Sentencing considerations for youthful offenders—particularly for juveniles—are not coextensive with those for adults. *See Miller v. Alabama,* 567 U.S. 460, 480 (2012) (requiring the sentencing judge to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in

prison" (footnote omitted)). Thus, both at initial sentencing and on appellate review it is necessary to consider an offender's youth and its attendant characteristics.

In holding death sentences and mandatory life without parole sentences for those under the age of eighteen to be unconstitutional, the United States Supreme Court has underpinned its reasoning with a general recognition that juveniles are less culpable than adults and therefore are less deserving of the most severe punishments. *See Graham [v. Florida],* 560 U.S. [48, 68 (2010)]. This presumption that juveniles are generally less culpable than adults is based on previous and ongoing "developments in psychology and brain science" which "continue to show fundamental differences between juvenile and adult minds" in, for instance, "parts of the brain involved in behavior control." *Miller,* 567 U.S. at 471-72.

*Brown*, 10 N.E.3d at 6-7.

[25] The Court compared Brown's 150-year sentence to a sentence of life without parole, as it "forswears altogether the rehabilitative ideal" and "essentially means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the [juvenile] convict, he will remain in prison for the rest of his days." *Id.* at 8 (quotation omitted). Accordingly, the court revised Brown's sentence to sixty years for each count of murder, to be served concurrently, and twenty years for robbery, to be served consecutively, for a total of eighty years. With credit for good behavior, this meant Brown would be eligible for release in his late fifties.

[26] In fifteen-year-old Fuller's appeal, this Court likewise found that his 150-year sentence was not inappropriate. *See Fuller v. State*, No. 48A02-1210-CR-848 (Ind. Ct. App. July 10, 2013), *trans. granted*. Again, our Supreme Court granted transfer and reduced Fuller's sentence to eighty-five years:

> In the case of sixteen-year-old Brown we employed our collective sense of what was an appropriate sentence and determined he "should receive an enhanced sentence of sixty years for each count of murder to be served concurrently and an enhanced sentence of twenty years for robbery to be served consecutively, for a total aggregate sentence of eighty years imprisonment." *Brown,* 10 N.E.3d at 8. We believe Fuller is entitled to a sentence revision as well. But we are not inclined to revise Fuller's sentence to be precisely the same, or even less than that of his cohort. Although only a year older than Fuller, Brown unlike Fuller was an accomplice—a factor that we found particularly important. Instead Fuller was one of the actual shooters. We conclude that Fuller should receive the maximum enhanced sentence of sixty-five years for each count of murder to be served concurrently, and an enhanced sentence of twenty years for robbery to be served consecutively for a total aggregate sentence of eighty-five years imprisonment.

*Fuller v. State*, 9 N.E.3d 653, 658-59 (Ind. 2014). With credit for good behavior, this also meant Fuller would be eligible for release in his late fifties.

[27] Three years after *Brown* and *Fuller*, our Supreme Court decided *Taylor v. State*, 86 N.E.3d 157 (Ind. 2017), *reh'g denied*. There, seventeen-year-old Carltez Taylor shot and killed someone in 2015. He was convicted of murder, conspiracy to commit murder, and a firearm enhancement and sentenced to life without parole. On appeal, our Supreme Court revised Taylor's sentence to

eighty years (sixty-five years for murder enhanced by fifteen years for using a firearm and a concurrent sentence of thirty-five years for conspiracy to commit murder):

> [W]e consider many factors in weighing 7(B) revisions. "[M]ost significantly" here, Taylor was only seventeen years old at the time of the crimes. As this Court and the United States Supreme Court have recognized, "children are different." "[J]uveniles are less culpable than adults and therefore are less deserving of the most severe punishments."
>
> * * * * *
>
> In *Fuller* and *Brown*, two juvenile codefendants received 150-year sentences for a double murder. We unanimously revised fifteen-year-old Fuller's sentence to eighty-five years and sixteen-year-old Brown's sentence to eighty years because, while their crimes were "senseless and reprehensible," no evidence showed "that the victims were tortured, beaten, or lingered in pain." And "most significantly," we considered their ages, as "[s]entencing considerations for youthful offenders—particularly for juveniles—are not coextensive with those for adults."

*Id.* at 166-67 (citations and quotations omitted). With credit for good behavior, this meant Taylor would be eligible for release in his late seventies.[5]

---

[5] For crimes committed before July 1, 2014, defendants generally received one day of credit for each day served, meaning they could be released after serving 50% of their sentences. Now, defendants convicted of more serious felonies generally receive one day of credit for every three days served, meaning they could be released after serving 75% of their sentences. *See* I.C. §§ 35-50-6-3.1, -4. Because Taylor committed his offenses in 2015, the new system applies to him. The old system applies to the other four cases.

[28] Finally, our Supreme Court decided a pair of cases in 2020. In the first case, *Wilson v. State*, 157 N.E.3d 1163 (Ind. 2020), *reh'g denied*, sixteen-year-old Donnell Wilson and Jonte Crawford shot and killed two brothers in 2013 because of a gang dispute. Wilson was charged with two counts of murder, Class B felony armed robbery, Class D felony conspiracy to commit criminal-gang activity, and a criminal-gang enhancement. Crawford was charged identically, but he pled guilty to one count of murder and robbery and was sentenced to sixty-one years. A jury found Wilson guilty, and the trial court sentenced him to sixty years for one murder conviction, fifty-five years for the other murder conviction, six years for armed robbery, and two years for criminal-gang activity, to be served consecutively. The court then added sixty years for the criminal-gang enhancement, for a total sentence of 183 years. On appeal, Wilson's criminal-gang-activity conviction was vacated, reducing his sentence to 181 years.

[29] Wilson later sought post-conviction relief, arguing, among other things, that his appellate counsel was ineffective for not arguing on direct appeal that his sentence was inappropriate. Our Supreme Court found that appellate counsel was ineffective because "even a cursory reading of *Fuller* and *Brown* shows that the facts of the cases closely track Wilson's crimes and that the reasoning we used to reduce those sentences is also largely applicable to his sentence." *Wilson*, 157 N.E.3d at 1180. The Court then reduced Wilson's sentence:

> **[I]n both *Fuller* and *Brown*, where the defendants' offenses were largely analogous to Wilson's, we reduced each**

**defendant's aggregate sentence to eighty-five years and eighty years, respectively, which means the defendants both have a realistic chance at release by their early sixties.** *Fuller*, 9 N.E.3d at 659; *Brown*, 10 N.E.3d at 8. We have made similar reductions in the past even under the old, more deferential "manifestly unreasonable" standard; for instance, we reduced to fifty years a fourteen-year-old's maximum sixty-year sentence for the brutal murder of a seven-year-old girl, recognizing, among other things, his "very youthful age." *Carter v. State*, 711 N.E.2d 835, 841-43 (Ind. 1999). And in the case of a sixteen-year-old who brutally beat and stabbed his adoptive parents to death while they slept, we reduced a maximum 120-year sentence to eighty years when, along with his mental illness and lack of criminal history, we considered the age of "this offender." *Walton v. State*, 650 N.E.2d 1134, 1135, 1137 (Ind. 1995).

* * * * *

*Fuller* and *Brown*—as factually analogous cases—provide us baseline sentences (eighty-five and eighty-year sentences) for what is appropriate for a sixteen-year-old who committed robbery and a double murder. Comparing the nature of Wilson's offense and his character to these cases, we conclude that Wilson's sentence should be reduced to an aggregate 100 years. This includes two concurrent fifty-year sentences for the murders of [the brothers], a fifty-year criminal gang enhancement . . . , and a concurrent six-year robbery sentence. Unlike *Fuller* and *Brown*, Wilson was also convicted of a criminal gang enhancement and we must respect the legislature's determination that the corrosive nature of gang activity justifies a higher sentence than what *Fuller* and *Brown* received.

Nevertheless, the main factor weighing in favor of a shorter sentence is Wilson's age. **A 100-year sentence means that after receiving good time credit Wilson will likely be eligible for**

> **release in his mid-to-late sixties, meaning that he has reasonable hope for a life outside prison.** If Fuller, Brown, and Crawford are all able to envision a life outside prison walls, we collectively find it an outlier that Wilson is not provided a similar opportunity and incentive to rehabilitate.

*Id.* at 1183-84 (emphases added).

[30]     In the second case, *State v. Stidham*, 157 N.E.3d 1185 (Ind. 2020), *reh'g denied*, which was decided the same day as *Wilson*, our Supreme Court revisited its prior decision that seventeen-year-old Matthew Stidham's 138-year sentence for murder and other crimes committed in 1991 was not inappropriate given the "developments in the fields of psychology, brain science, and social science, along with common sense." *Id.* at 1193. It thus revised Stidham's sentence to eighty-eight years:

> As we did in *Taylor*, *Brown*, and *Fuller*, and as we do again today in *Wilson*, we find that the nature of Stidham's crimes and his character warrant a lengthy sentence short of the maximum. *See Taylor*, 86 N.E.3d at 167 (reducing a life-without-parole sentence to an aggregate 80-year sentence); *Brown*, 10 N.E.3d at 8 (reducing a maximum 150-year sentence to an aggregate 80-year sentence); *Fuller*, 9 N.E.3d at 658-59 (reducing a maximum 150-year sentence to an aggregate 85-year sentence); *Wilson v. State*, No. 19S-PC-548, 157 N.E.3d 1163 (Ind. 2020) (reducing a 181-year sentence to an aggregate 100-year sentence). We conclude that Stidham should receive the maximum terms at the time of his offenses for each individual crime—60 years for murder, 50 years for robbery, 20 years for criminal confinement, and 8 years for battery. However, the robbery term should be served concurrent to the murder term, and the murder, criminal confinement, and battery terms should be served consecutively.

> Thus, we revise Stidham's overall sentence from 138 years to 88 years.

*Id.* at 1197-98. With credit for good behavior, this meant Stidham would be eligible for release in his early sixties.

[31] With this background in mind, we turn to Desmond's sentence. As for the nature of the offenses, there is no doubt these were heinous crimes. Four people were "slaughter[ed]" in an incident that the judge described as "one of the worst things I've ever seen in my entire life." But Desmond didn't act alone. There were three shooters, and Desmond, at sixteen, was the youngest of the group. As for Desmond's character, his age is a "major factor" to which we give "careful consideration," which the trial court didn't do.[6] *See Wilson*, 157 N.E.3d at 1182 ("Since Wilson was only sixteen, his age is a major factor that requires careful consideration during Appellate Rule 7(B) review."). And as the State acknowledges, Desmond's juvenile history is "minor." Appellee's Br. p. 42.

[32] Given Desmond's age, we believe a reduction in his 220-year sentence is warranted. But we do not believe that he is entitled to a reduction as substantial as Brown, Fuller, and Wilson received.[7] First, Desmond was convicted of four counts of murder, not two. Second, there is a new statute on the books that was

---

[6] Desmond also argues the trial court abused its discretion in not finding his age to be a mitigator. We agree. But given our revision of Desmond's sentence, we need not separately address this issue.

[7] As explained above, in Wilson's case, his 100-year sentence meant that he would likely be eligible for release in his mid-to-late sixties. And in Fuller's and Brown's cases, their sentences gave them a realistic chance at release in their late fifties.

not available to our Supreme Court when it decided those cases. That is, the Indiana General Assembly amended Indiana Code section 35-38-1-17 effective July 1, 2023, to provide as follows:

> (n) A person sentenced in a criminal court having jurisdiction over an offense committed when the person was less than eighteen (18) years of age may file an additional petition for sentence modification under this section without the consent of the prosecuting attorney if the person has served at least:
>
>> (1) fifteen (15) years of the person's sentence, if the person is not serving a sentence for murder; or
>>
>> (2) twenty (20) years of the person's sentence, if the person is serving a sentence for murder.
>
> The time periods described in this subsection are computed on the basis of time actually served and do not include any reduction applied for good time credit or educational credit time.

*See* P.L. 115-2023, § 11. If Desmond behaves well and gets the rehabilitation he needs, this statute gives him a chance of some life outside prison.[8]

[33] Based on the above, we reduce Desmond's sentence to 135 years as follows: forty-five years for each murder conviction and one year for Level 5 felony robbery, with three of the murder sentences to run consecutively and the other

---

[8] In Stidham's case, the trial court is holding a hearing on his petition to modify his sentence under Section 35-38-1-17(n) on February 22, 2024. *See* No. 18D02-9102-CF-13.

sentences to run concurrently. We recognize this is still a de facto life sentence, since Desmond would have to serve over 100 years even with credit for good behavior. *See supra* note 5. But reducing Desmond's sentence to 135 years now makes it more likely that, with good behavior, a trial court would grant a modification under Section 35-38-1-17(n) and reduce his sentence to a point that would allow for some life outside of prison.[9]

[34]     Affirmed in part, reversed in part, and remanded.


Brown, J., concurs.

Bradford, J., concurring in part and dissenting in part, with separate opinion.

ATTORNEY FOR APPELLANT

Lisa Johnson
Brownsburg, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

---

[9] Again, the statute says a juvenile convicted of murder must serve twenty actual years before seeking to modify their sentence. But this doesn't mean that Desmond can get released from prison after serving only twenty actual years. Indiana Code section 35-50-2-2.2(c) provides that a court may suspend only that part of a murder sentence that is in excess of the minimum, i.e., forty-five years. Thus, even if the trial court were to modify Desmond's sentence to concurrent, minimum terms of forty-five years, he would still have to serve at least 75% of that (about thirty-four years).

**Bradford, Judge, concurring in part and dissenting in part.**

[35]     I disagree with the majority that Banks's sentence is inappropriate.[10] Appellants routinely argue that severe sentences should be reserved for the "worst of the worst" offenders. Banks is amongst the worst of the worst.

[36]     Banks was an active participant in the ruthless, execution-style killing of four human beings. Banks was sentenced to a 220-year term of imprisonment. The sentencing range for murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3(a). In sentencing Banks, the trial court imposed the fifty-five-year advisory sentence for each murder, with each to be served consecutively, for a total 220-year sentence. The trial court showed restraint in not imposing the maximum sentence, which would not have been inappropriate given Banks's murderous conduct.

[37]     The nature of Banks's offenses is clearly amongst the worst of the worst. Banks and his confederates left a wake of bullet-riddled bodies lying in pools of blood, shell casings, and shattered glass. Before Officer Matthew Melkey even entered the apartment in which the murders had occurred, he "could immediately see a shattered glass door." Tr. Vol. III p. 83. As Officer Melkey approached, he observed an individual, later identified as Braxton Ford, lying "next to the broken glass door" with his arm "against" the glass. Tr. Vol. III p. 84. Officer Melkey continued to approach the apartment, observing another individual,

---

[10] I concur with the balance of the majority's opinion.

later identified as Kimari Hunt, lying on the couch. Both Ford and Hunt had been shot. Upon entering the apartment, Officer Melkey immediately observed two other victims, both of whom had also been shot. One of these individuals, later identified as Jalen Roberts, was lying on the ground near a shattered television stand, and the other, later identified as Marcel Wills, was lying on the floor in the kitchen. Roberts, Wills, Ford, and Hunt were all dead before help could arrive.

[38] Nothing in the record suggests that Banks was anything other than a willing and active participant. After the commission of these murders, Banks jogged out of the apartment leaving four dead bodies behind, in possession of a handgun, and carrying a "duffle bag." Tr. Vol. V. p. 25. The apartment had been "ransacked." Tr. Vol. IV p. 166. Before leaving the apartment, Banks and his cohorts stole money, guns, and marijuana. Banks and his fellow murderers did not show any immediate remorse; indeed, it was quite the opposite, with videos and pictures being posted to social media soon after the murders in which they were showing off the money, guns, and drugs that they had taken from the apartment.

[39] The mortal wounds inflicted on the victims are disturbing, to say the least. Autopsies revealed the following: Roberts had been shot twenty-nine times, sustaining gunshot wounds to the head, jaw, chest, right flank, left flank, pelvis, right shoulder, right forearm, right wrist, left upper arm, left forearm, left buttock, left thigh, and left shin. Ford had been shot seven times, sustaining gunshot wounds to his jaw, neck, chest, left flank, left shoulder, left upper arm,

and left hand. Wills had been shot seven times, sustaining gunshot wounds to the forehead, right temple, neck, chest, thigh, and hip. Hunt had been shot five times, sustaining gunshot wounds to her head, chest, abdomen, left flank, and pelvis. Dr. John Cavanaugh, who had performed each of the autopsies, determined that the manner of death for Hunt, Ford, Wills, and Roberts had been homicide, with each dying as a result of their gunshot wounds, all of which appear to have been inflicted at close range.

[40] Combined, Hunt, Ford, Wills, and Roberts suffered forty-eight gunshot wounds and investigating officers recovered forty-seven shell casings. Banks and his accomplices, therefore, "did not miss" their targets, Tr. Vol. VII p. 101, but rather "slaughter[ed]" and "execut[ed]" them. Tr. Vol. VII p. 109. The evidence demonstrates that Banks and his cohorts were meticulous and methodical in killing Hunt, Ford, Wills, and Roberts by shooting all of them, execution-style, at least five times. Each was shot, among other places, in the head and chest at what appeared to be close range. In addition, it is noteworthy that the trial court, which indicated that it had seen "a lot of murders," described these murders as "one of the most horrific things" that it had ever seen. Tr. Vol. VII p. 109. I agree with the State that "[t]he callous disregard for four lives, and the way [Banks and his co-conspirators] carried out the act, sets these murders apart from" a typical murder and that "[t]here is nothing about the nature of the offenses … that show[s] restraint, regard, or lack of brutality." Appellee's Br. pp. 41, 42.

[41] To say the least, it does not reflect well on Banks's character that he was an active participant in a quadruple murder. It is also telling that his criminal conduct escalated quickly from a juvenile adjudication in which he was found to have improperly handled a firearm to quadruple murder. Clearly, court intervention following Banks's juvenile adjudication did not dissuade him from using a firearm in an illegal manner in the future. Banks was also determined to be a "high" risk to reoffend. Appellant's App. Vol. III p. 106.

[42] Banks has shown no remorse for his victims, only disappointment that he is in jail. This reflects poorly on his character.

[43] In challenging his sentence, Banks argues both that the trial court abused its discretion in refusing to find his youthful age to be a mitigating factor and that the 220-year sentence is inappropriate in light of his age at the time of the murders.[11] The majority largely, if not entirely, relies on Banks's age in reducing his sentence, citing to cases from the Indiana Supreme Court wherein the Court reduced the sentences of other juveniles who had been tried and sentenced as adults. The facts of this case can easily be differentiated from the cases relied on by the majority in that this case involves the killing of four individuals in a manner that demonstrates Banks's depravity and disregard for human life. I do

---

[11] Banks also argues that the trial court abused its discretion in referring to his tattoos during sentencing. While the trial court mentioned Banks's tattoos, it did not specifically find them or Banks's potential gang involvement to be an aggravating circumstance. In any event, to the extent that the trial court's statement regarding Banks's "MBK" tattoo could be interpreted as potentially suggesting gang involvement, it is important to note that the record indicates that the trial court's statement was based on its prior experience, with the trial court indicating that it had "run across it before" and "[t]hat [it] stands for something." Tr. Vol. VII p. 111. The trial court did not abuse its discretion in this regard.

not believe that we have reached a point in time where a defendant's age alone can outweigh a rampage of killing such as what occurred in this case.

[44] Banks is no tender-aged, naive juvenile. Banks was just one day shy of his seventeenth birthday when he participated in the murders. At sentencing, the trial court acknowledged the emerging scientific research on adolescent-brain development, but declined to give Banks's age any mitigating weight, stating "some things you do, you do as a man, you don't do as a kid." Tr. Vol. VII p. 108. While I also acknowledge the research relating to adolescent-brain development and the Indiana Supreme Court's prior reduction of sentences of individuals who had been convicted of murder as youths to give them hope for life outside of prison, the fact that Banks will never be released from prison based on his murderous actions, if anything, demonstrates that his sentence is appropriate, not inappropriate. Banks is the worst of the worst and his advisory sentence for each of the four murders should be affirmed.